UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| SHAQUALA WILLIAMS, | ECF CASE |
| Plaintiff, | COMPLAINT |
| - against - |  |
| JPMORGAN CHASE & CO., | PLAINTIFF DEMANDS A TRIAL BY JURY |
| Defendant. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Shaquala Williams ("Williams" or "plaintiff"), through her attorneys Vladeck, Raskin & Clark, P.C., complains of defendant JPMorgan Chase & Co. ("JPMorgan," the "Bank," or "defendant") as follows:

NATURE OF ACTION

1.      Williams, a Black woman, is an attorney and financial crimes compliance professional with over a decade of experience. In June 2018, Williams joined JPMorgan in its Global Anti-Corruption Compliance ("GACC") organization. During Williams's tenure, she repeatedly tried to address material misconduct at the Bank that she reasonably believed broke the laws, regulations, and rules designed to prevent fraud against shareholders, to ensure that shareholders and the Securities and Exchange Commission (the "SEC") have an accurate picture of a company's finances, and to avoid corruption. Williams raised concerns that the Bank's conduct violated, inter alia, a non-prosecution agreement with the United States Department of Justice (the "DOJ"); an SEC Cease and Desist order; provisions of Federal law relating to fraud against shareholders; and SEC rules and regulations, including those mandating adequate internal

controls to prevent and detect material misrepresentations and fraud and those requiring accurate and reasonably detailed books and records.

2.      In response to Williams's efforts to address her concerns about the Bank's legal violations, her managers were dismissive and hostile toward her.  Williams had no choice but to escalate her concerns to, <u>inter alia</u>, the Bank's senior leaders and its internal whistleblower team. In addition to raising concerns about Compliance failures and other misconduct that she believed violated the law, Williams also complained about the retaliation she faced due to her protected activities.  This only made matters worse for Williams.  Instead of fixing the problems, JPMorgan further retaliated against Williams that culminated in the Bank's decision to fire her in October 2019.

3.      Plaintiff brings this action to remedy whistleblower retaliation for her protected activities under the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A.[1]

4.      Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, reasonable attorneys' fees and costs of this action, pre- and post- judgment interest, and other appropriate relief pursuant to SOX.

<u>PARTIES, JURISDICTION, AND VENUE</u>

5.      Williams is a resident of New Jersey. At the time of her protected activities, she was an employee of JPMorgan and worked exclusively in New York City.

---

[1] On August 25, 2020, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging claims of sex and race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), which is still pending. Prior to the beginning of her employment with JPMorgan, plaintiff signed an offer letter dated June 22, 2018 which included an agreement to arbitrate claims of "employment discrimination or harassment" and retaliation. Plaintiff intends to pursue her claims of discrimination and retaliation in arbitration.

6.      JPMorgan is a publicly traded Delaware corporation with its principal executive offices in New York City. JPMorgan is a multinational investment bank and financial services holding company. Upon information and belief, JPMorgan is also a federally chartered and/or insured financial institution. JPMorgan is a "covered financial institution" under 18 U.S.C. § 1514A, as its securities are registered under the Securities Exchange Act of 1934.

7.      On April 27, 2020, plaintiff filed a timely Complaint with the Occupational Health and Safety Administration ("OSHA") of the U.S. Department of Labor alleging violations of the "whistleblower" provisions of the Sarbanes-Oxley Act ("SOX") (hereinafter, the "OSHA Complaint"). More than 180 days have passed since the filing of the Complaint, and the Secretary of Labor has not issued a final decision. Accordingly, pursuant to 18 U.S.C. § 1514A, plaintiff is entitled to seek de novo review of her claims in this Court.

8.      This Court has jurisdiction over plaintiff's SOX claims under 28 U.S.C. § 1331 because those claims arise under federal law.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because defendant is headquartered in New York, New York. In addition, venue is proper as many of the transactions, acts, practices, and courses of conduct constituting violations of the applicable laws took place in this District.

FACTUAL ALLEGATIONS

JPMorgan's Background

10.      JPMorgan has over 250,000 employees globally.

11.      JPMorgan is subject to numerous laws, rules, and regulations that prohibit fraud, bribery, money-laundering, economic sanctions, and other types of corruption and crimes. Those laws, designed to prevent corruption, to stop fraud against shareholders, and to ensure an accurate

3

financial picture, include the Securities Exchange Act; Foreign Corrupt Practices Act ("FCPA"); USA PATRIOT Act; the Bank Secrecy Act ("BSA"); the United Kingdom Bribery Act ("UKBA") and the Hong Kong Prevention of Bribery Ordinance ("POBO").

12.     Also, the SEC has enacted rules and regulations in furtherance of the United States anti-fraud, anti-corruption, anti-money laundering, and economic sanctions statutes to prevent fraud and corruption and to ensure an accurate picture of a company's finances, including mandates to implement internal controls and to maintain accurate books and records.

13.     JPMorgan has a history of violating such laws, rules, and regulations. For example, on November 2016, JPMorgan's Asia subsidiary, JPMorgan Securities (Asia Pacific) Limited ("JPMorgan-APAC"), entered into a Non-Prosecution Agreement ("NPA") with the DOJ and the United States Attorney's Office for the Eastern District of New York ("E.D.N.Y. U.S. Attorney's Office"). The Agreement was effective for three years until November 2019. On information and belief, the NPA expired on November 17, 2019. The DOJ had one year from November 17, 2019 to continue to review materials before deeming the matter closed.

14.     The NPA related to the Bank's employment of children of prominent individuals in China in exchange for assistance with JPMorgan's business interests in China.

15.     In the NPA, JPMorgan represented that it had implemented and would continue to implement "a compliance and ethics program designed to prevent and detect violations of the [Foreign Corrupt Practices Act] and other applicable anti-corruption laws throughout their operations[.]" The Agreement stated that if JPMorgan provided "deliberately false, incomplete, or misleading information" or failed "to implement a compliance program" as required by the Agreement, JPMorgan would be subject to prosecution by the E.D.N.Y. U.S. Attorney's Office.

4

Specifically, as part of the NPA, JPMorgan agreed to improve its compliance in several areas, including for third party intermediaries.

16.     Also, on November 17, 2016, the SEC entered a Cease-and-Desist Order ("SEC Order") against JPMorgan alleging anti-bribery, books and records, and internal controls violations concerning the conduct at issue in the NPA.

17.     The SEC determined that JPMorgan had failed to devise and maintain an effective system of internal accounting controls "designed to prevent the corruption risks inherent in the hiring of Referral Hires[.]"

18.     The SEC also determined that JPMorgan had violated the books and records provisions due to the submission of "inaccurate compliance questionnaires containing false and incomplete information which failed to disclose the intended, improper purpose of making certain client Referral Hires."

19.     The SEC concluded that JPMorgan's conduct violated, inter alia, Section 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

<u>JPMorgan's Anti-Corruption Compliance Team</u>

20.     As of October 2019, JPMorgan's GACC team was primarily based in New York City.

21.     GACC is part of JPMorgan's Compliance department and, ultimately, reports to the Head of Risk.  The Bank's Legal group is separate from Compliance.

22.     The GACC team is responsible for designing the Bank's Global Anti-Corruption program to ensure that JPMorgan and its related companies comply with anti-corruption laws, rules, regulations, including the NPA, SEC Order, and SEC rules and regulations.

23.     The GACC team had five divisions:

● Third Party Intermediaries ("TPI"): The purported purpose of JPMorgan's TPI program was to detect, prevent, and deter JPMorgan personnel and non-client third parties such as agents, consultants, vendors, and suppliers, from engaging in corrupt behavior to obtain or secure business or government action on the Bank's behalf.

● Anything of Value ("AoV"): The Bank's AoV program was supposed to detect, prevent, and deter JPMorgan employees from giving or receiving "a thing of value" such as jobs, internships, gifts, and entertainment, in exchange for assistance with JPMorgan's business interests.  The AoV included two sub-programs, Travel and Expense ("T&E") and Referred Candidates ("RC").

● Investigations:  The JPMorgan Investigations program was purportedly designed to detect, prevent, and deter corruption during internal investigations. GACC Investigations were supposed to assist with determining how to assess and mitigate corruption risk in certain internal investigations with the JPMorgan Government Investigations and Regulatory Enforcement ("GIRE") legal team.

● Corporate Transactions: The Bank's Corporate Transactions program supposedly was implemented to prevent, deter, and detect corruption in connection with corporate transactions including mergers, acquisitions, joint ventures, divestitures, and partnerships.

● Governance: This division was purportedly designed to assist the above referenced divisions with administrative tasks, senior management and regulatory reporting, assessments of the GACC program, and escalating issues to JPMorgan senior management.

24.     In addition to the Anti-Corruption program, within the Compliance organization JPMorgan also had the Economic Sanctions and the Anti-Money Laundering programs.

25.     The Economic Sanctions program purportedly was responsible for ensuring that JPMorgan was not doing business, directly or indirectly, with individuals, entities, business sectors, and countries that a government had sanctioned, including sanctions that the United States imposed through the Office of Foreign Assets Controls ("OFAC"). JPMorgan maintained screening systems and employed screening specialists to ensure that JPMorgan did not violate relevant sanctions laws and regulations again.

26.     The Anti-Money Laundering program supposedly was responsible for ensuring that JPMorgan was preventing, detecting, and reporting suspicious customer activity to government agencies. Suspicious activity included money laundering or other related offenses such as bribery, corruption, tax evasion, and drug trafficking. JPMorgan maintained systems and employed anti-money laundering specialists supposedly to ensure that JPMorgan did not violate relevant anti-money laundering laws again.

27.     There was overlap among the Economic Sanctions, Anti-Money Laundering, and Anti-Corruption programs. For example, those groups were supposedly responsible for screening customers, vendors, and other third parties to ensure that the Bank and Bank employees were not aiding or assisting them in engaging in unlawful activity (such as bribery, money laundering, and related crimes). Also, those Compliance programs had similar requirements to disclose information to government agencies and regulators.

28.     During Williams's tenure at JPMorgan, each of GACC's Compliance programs were responsible for fulfilling obligations under the NPA, the SEC Order, provisions of Federal law relating to fraud against shareholders, and other SEC rules and regulations, including implementing program enhancements and providing updates to ensure compliance with the Bank's legal obligations.

7

Williams's Background

29.     Williams is an attorney with approximately 12 years of experience in financial crimes compliance primarily for financial institutions.

30.     Williams received a Bachelor of Arts degree from SUNY-Albany and a Juris Doctor degree from Brooklyn Law School.

31.     Williams's experience includes working for several major global financial institutions. At those organizations, Williams's duties included economic sanctions, anti-money laundering, securities fraud, and anti-corruption compliance.

Williams's Tenure at the Bank

32.     Williams began working at JPMorgan on July 30, 2018, in its Manhattan offices. Williams joined the Bank as Vice President in GACC.

33.     In Williams's position, she was primarily responsible for managing, assessing, and improving JPMorgan's TPI program.

34.      In this role, Williams provided advice to Anti-Corruption Compliance Officers ("ACCO") and Relationship Managers (who hire and are responsible for managing third party intermediary relationships) concerning compliance issues; prepared metrics for monthly reporting to senior management regarding certain risk indicators; prepared updates about the TPI program; and prepared and provided anti-corruption and compliance training.

35.     During her employment at JPMorgan, Williams also worked on other anti-corruption compliance programs within GACC, including those concerning transactions, investigations, and referred candidates.

36.     Even though Williams is an attorney, she did not function as counsel for the Bank at any time during her tenure.

## Williams Raises Concerns About the TPI Program

37.     As set forth above, Williams was primarily responsible for GACC's TPI program. During Williams's tenure, GACC management asked Williams to review the TPI program. In performing her review, Williams identified numerous problems with the TPI program.  Williams believed that in many ways the TPI program failed to comply with the law, including the NPA, the SEC Order, SEC rules and regulations, and provisions of Federal law relating to fraud against shareholders.  By way of example only, some of the unlawful practices and behaviors are listed below.

A.     Policies and Procedures

38.     Williams raised concerns that the Bank's policies and procedures did not adequately document steps needed to mitigate corruption risk in the TPI program and that those written policies and procedures did not match actual practices that the Bank had implemented, including that the written materials overstated the coverage and capability of the GACC program.

39.     Further, Williams raised concerns about the Bank's lack of policies and procedures concerning its practice of exempting some third parties from TPI controls. The Bank did not have any documented rationale for the exemptions, often failed to record approved exemptions, and applied exemptions in an inconsistent way. As a result, JPMorgan's records concerning TPI controls were inaccurate as the Bank could not track with precision the number of third-party intermediaries. Thus, the monthly internal reporting and disclosures to regulators concerning this information was wrong.

B.     Invoice Controls

40.     Williams objected to the lack of invoice controls because the NPA, the SEC Order, and other laws and regulations (including SEC rules and regulations and provisions of Federal law relating to fraud against shareholders) required that there must be controls in place to ensure that

the amounts paid to third-party intermediaries were consistent with relevant factors, including business needs, stated payment expectations, and market rates. If properly implemented, invoice controls would ensure that JPMorgan was not funding corruption by labeling corrupt third-party payments as legitimate business expenses.

41.     Williams also raised concerns because the Bank had no requirements for the Compliance group to review invoices for red flags, high risk indicators, or other anomalies that indicate corrupt payments; because the Bank granted many third-party intermediaries exemptions from invoice requirements without documenting or explaining the basis for doing so; because the Bank had no controls to ensure that the entity requesting payment was the same third-party intermediary that had contracted with the Bank; because the Bank had no controls to ensure that the third party intermediary had a contract or other agreement with the Bank before performing the services; and because the Bank could not reconcile actual payments with the invoices.

42.     Williams raised concerns that there were no consequences for Bank employees who failed to upload invoices or who did not review uploaded invoices. These measures were important to ensure that the payments sought corresponded with the roles and tasks for which the Bank had engaged the third-party and did not otherwise raise any serious concerns.

43.     Williams also raised concerns about JP Morgan's inaccurate books and records. There were inconsistencies between the TPI payment records and the Bank's centralized payment systems that feed into its general ledger. For example, a former government official ("TPI1") was a high risk JPMorgan third-party intermediary for Jamie Dimon ("Dimon"), JPMorgan's Chief Executive Officer. The Bank processed the invoices for TPI1 through the "emergency payment method." The Bank's policies made clear that the "emergency payment method" should be used for urgent payments critical to the day-to-day operations of Chase such as emergency utility bills

"to prevent the lights from going out." The TPI1 invoices did not satisfy this standard, thus leaving the payment method open to unchecked corrupt payments and violations of the Bank's accounting controls, the NPA, SEC Order, SEC rules and regulations, and provisions of Federal law relating to fraud against shareholders. Further, the payments as reflected in the general ledger did not correspond with management's general or specific authorization for the invoice payments, thereby creating inaccurate records that also constituted violations of the NPA, the SEC Order, SEC rules and regulations and/or provisions of Federal law relating to fraud against shareholders.

C.     Oversight, Monitoring, and Testing

44.     Williams also raised concerns about the lack of independent oversight within Compliance. For example, employee Compliance Control Officers were responsible for overseeing GACC.  The Monitoring and Testing ("M&T") team was responsible for monitoring and testing the business units' compliance with internal GACC policies and procedures. However, GACC, the Employee Compliance Control Officers, and the M&T team all reported to the same managers. Williams raised concerns that due to the lack of independence, the Employee Compliance Control officers and the M&T team were less likely to raise concerns about GACC's reporting to regulators, adherence to policies and procedures and, ultimately, the applicable legal requirements.

45.     For example, in May 2019, the M&T team published a TPI testing report concluding that there were "no issues found" with TPI invoices. This was not accurate as members of the M&T team provided an issues log with several deficiencies in the TPI invoices that were unresolved when the M&T team published its report and previously raised concerns that they were unable to locate invoices and were also unable to match invoices with payments. Williams raised concerns that M&T issued the false "no issues found" report to satisfy the NPA, SEC Order, SEC

rules and regulations, and/or provisions of Federal law relating to fraud against shareholders due to pressures from shared senior leadership within Compliance.

D.     TPI Risk-Based Approach

46.     The applicable law, rules, and regulations, including the NPA, SEC Order, SEC rules and regulations, and/or provisions of Federal law relating to fraud against shareholders, required that JPMorgan "institute appropriate risk-based due diligence and compliance requirements pertaining to" the TPI program. During the TPI review process, the Bank assigned each third-party intermediary a risk ranking using a risk ranking calculator referred to as a risk matrix. The risk ranking determined the level of due diligence and compliance requirements like due diligence reports, contract terms, and management approvals required for the third-party intermediaries.

47.     Williams raised concerns that there were multiple versions of the risk ranking calculator, that there was no identifiable or documented rationale or methodology justifying the risk ranking scores, and that, as a result, JPMorgan assigned inconsistent rankings to third party intermediaries. This forced the European GACC team to create after-the-fact a TPI methodology and rationale for TPI risk rankings to submit in response to a regulatory request by the United Kingdom Financial Conduct Authority (the "FCA").

48.     The Bank required all departments to submit risk calculators to its internal Model Risk Governance ("MRG") team for oversight based on a regulatory commitment to, inter alia, the SEC. Williams raised concerns that GACC and Employee Compliance Control Officers avoided submitting the various TPI risk matrix (a risk calculator) and other risk calculators to MRG for evaluation as a "model." As a result, the TPI risk matrix and the other GACC risk calculators were not subject to the MRG team's evaluation and oversight in violation of a regulatory commitment.

49.     Also, on one occasion, Williams's manager, Melissa Laferriere ("Laferriere"), asked Williams to delete information from a version of a TPI risk matrix before her manager sent it to the MRG team. Williams performed the task and provided the edited risk matrix to her manager.  However, later, Williams submitted an unedited version directly to the MRG team.

E.      Due Diligence Reviews

50.     Williams uncovered that the Bank's due diligence review process of third-party intermediaries was deficient. The Bank did not search government economic sanctions lists, other government lists, and JPMorgan's "do not do business with" list to determine if third-party intermediaries and persons related to them were on those lists before retaining them or at later points during the relationship.

51.     The Bank's Client List Screening group within the Anti-Money Laundering program was responsible for screening the records of individuals and entities doing business with the Bank to determine whether government economic sanctions applied and was responsible for escalating "positive hits" in order to respond to government requests for applicable information.

52.     On at least two occasions, Williams objected when she learned that the Bank had not connected TPI systems to the internal screening systems that the Client List Screening group used.  Because the two systems were unconnected, the Client List Screening group, when responding to government requests, did not include information about third party intermediaries, a violation of economic sanctions and SEC rules and regulations.  The Client List Screening team agreed to fix the problems, but GACC Management refused to allow the repair to move forward.

53.     Similarly, Williams raised concerns that the TPI system was not connected to, nor compared against, JPMorgan's internal list of individuals and entities that the Bank had banned for money laundering, economic sanctions, and other financial crimes concerns. Thus, GACC did

not screen potential and current third-party intermediaries to ensure that the Bank had not included them on a "do not do business with" list either prior to or during the engagement.

F.     Training & Contracts

54.     The Bank provides mandatory training courses for third-party intermediaries and JPMorgan personnel that hire those third parties. Williams raised concerns that there were no controls in place to prevent hiring third parties who had not completed the training course. Williams also raised concerns because there were no consequences for JPMorgan personnel that failed to complete the required training on time.

55.     JPMorgan required Relationship Managers to attach contracts (both drafts and final versions) with third-party intermediaries to their TPI records. Williams raised concerns that there were no controls in place to ensure that there was a contract at all or to review the contracts to ensure that they contained the required information, including terms regarding the proper scope of the assignment and pay structure.

G.     Reporting

56.     Williams raised concerns about the TPI program's failure to keep track of the overall number of third-party intermediaries. Such information was important for purposes of managing risk and disclosing information to regulators including the number of TPIs that the Bank had terminated due to corruption concerns.

Williams Identifies Problems with Other Anti-Corruption Programs

57.     In addition to raising concerns about the TPI program, Williams also objected to key aspects of the other Anti-Corruption programs, including Transactions, Investigations, and AoV, because she believed that they did not comply the Bank's legal obligations, including those under the NPA, the SEC Order, SEC rules and regulations, and provisions of Federal law relating to fraud against shareholders. For example:

- Transactions:  Williams reported a lack of controls to identify JPMorgan groups that were planning to, or were capable of, engaging in corporate transactions to evaluate the proposed or possible deals; there was no required documentation nor recordkeeping system for tracking previously reviewed transactions; and there were no consequences for failing to follow policies.

- Investigations:   Williams raised concerns that there were major deficiencies for internal investigations of corruption, including no policies and procedures, no centralized list of entities or individuals discharged as a result of an investigation, and no method to report on or otherwise restrict such discharged entities or individuals.

- Regarding the sub-program Travel & Expense ("T&E"), Williams raised concerns that the Bank failed to effectively monitor and test reimbursement requests for expenses; that the Bank did not accurately maintain expense records; and that there were inconsistencies between invoices and payments that prevented GACC and M&T from implementing appropriate monitoring and testing for T&E. Williams raised concerns that GACC was maintaining an alternate ledger of corrected transactions that did not match the uncorrected transactions on the official JPMorgan balance sheet.

- Regarding the subprogram Referred Candidates ("RC"), Williams raised concerns that the Bank was not adequately monitoring RCs. For example, there was no system in place or requirement to evaluate whether there was a business need for a given role. Williams also raised concerns that there were serious gaps in the RC electronic surveillance procedures because GACC did not adequately document how the Bank selected certain personnel for surveillance; because GACC did not advise the group responsible for conducting the electronic communications surveillance about the scope of the electronic searches; and

because GACC did not provide guidance on how to determine the significance of communications that the Bank located in its searches.

58.     Williams also repeatedly protested the misrepresentations and misleading disclosures that the Bank made to government agencies and regulators.

- For example, Williams raised concerns that the Bank misled or omitted information when reporting to the SEC (including in publicly filed materials), the DOJ, the Federal Reserve Bank of New York, and international regulators about performance, capability, and state of the anti-corruption, anti-money laundering, economic sanctions, and risk governance programs.

- In May 2019, Williams received a draft report that purportedly updated the DOJ concerning JPMorgan's compliance with the SEC Order, NPA, and other legal obligations. The report contained numerous material misrepresentations about the monitoring, testing, and TPI program's controls implemented to mitigate corruption risk and avoid further violations of SEC regulations and the Foreign Corrupt Practices Act. For example, contrary to what JPMorgan stated in the draft report, the TPI program had no risk ranking methodology, no invoice controls, no invoice monitoring, and the identification controls were weak.

- Williams also objected because the GACC misreported to the DOJ and the Federal Reserve that invoice testing occurred on an annual basis and that the Bank would implement invoice monitoring in 2019. Such representations were not accurate because the Bank's testing procedures were not designed to uncover substantive problems; instead, the testing only assessed whether a Relationship Manager had uploaded an invoice to the TPI system.

- Williams also protested because the Bank made misleading reports to the UK Regulator, FCA, and other European regulators. For example, in January 2019, the FCA requested a

16

list of third-party intermediaries that the Bank had terminated based on corruption concerns. The GACC, however, did not maintain such a list. Accordingly, the Bank's employees provided a response that they based on guesswork and that did not contain an accurate description of GACCs documentation process. Williams was concerned that GACC had submitted similar disclosures in previous years that were inaccurate. When Williams asked to review those earlier submissions, the Bank told her that the information was unavailable because the records no longer existed or because the regulators had not asked for similar information in the past (which Williams learned was untrue).

- Also, in June 2019, the FCA asked GACC to explain the basis of the Bank's risk rankings for certain third-party intermediaries. JPMorgan had no way to explain the rankings due to multiple versions of the risk calculator and lack of standardized process and documentation. Accordingly, the Bank's employees needed to explain the rankings retroactively and failed to disclose the deficiencies in process and documentation.

- Williams also complained about GACC's and GACC Europe, Middle East, and Asia's ("EMEA") misleading disclosures to the FCA regarding third-party intermediaries' that engage in "government interactions." JPMorgan could not provide data for some third-party intermediaries because, for example, onboarding procedures for the Legal department did not include any questions addressing government interactions. Williams raised this issue with individuals responsible for reporting to the FCA and recommended that the Bank add an explanation to its submission regarding the gap in data. GACC, however, did not add any caveat and the Bank did not otherwise notify the FCA about the reporting gap.

- Despite Williams's protests, the GACC and GACC EMEA team knowingly and intentionally reported misleading and inaccurate information to the DOJ, SEC, Federal

Reserve, FCA, the Belgian National Bank, and De Netherlandshe Bank, and JPMorgan leadership including information regarding the number and identity of exited third-party intermediaries and the number of consultants providing Anti-Money Laundering due diligence services.

<u>Williams's Protected Activities</u>

59.     As set forth above, throughout Williams's employment, she investigated, repeatedly raised concerns about, and exposed or attempted to expose (orally and in writing) the Bank's deficient Compliance programs and practices.  Williams believed that the Bank's compliance failures and other misconduct violated laws, regulations, and rules, including, but not limited to, the NPA, the SEC Order, SEC rules and regulations, and provisions of Federal law relating to fraud against shareholders.

60.     At the outset of Williams's tenure, Williams reported to Garrett Ross ("Ross"), GACC Vice President. Ross, in turn, reported to Timothy Bridgeford ("Bridgeford"), GACC Global Head; Bridgeford reported to the Managing Director, Deputy Global Head of Employee Compliance; and the Deputy Global Head of Employee Compliance reported to the Managing Director, Head of Employee Compliance and Commercial Banking Compliance.

61.     Initially, between approximately August and November 2018, Williams raised her concerns about the Bank's failures to Ross, Bridgeford, and others in GACC, including a GACC Program Manager; a GACC Vice President; and others.

62.     When Ross and Bridgeford failed to address the issues that Williams had identified, Williams escalated her concerns to individuals more senior than Bridgeford and outside of GACC, including the Head of Code of Conduct; a GACC Control Officer; Bridgeford's manager, the Deputy Global Head of Employee Compliance; Human Resources; and others.

63.     For example, Williams submitted a written complaint to Human Resources ("HR") in January 2019. Williams alleged that during her tenure with JPMorgan, she had "experienced a culture that retaliates, excludes, suppresses internal escalations, uses euphemisms and violates document controls to avoid oversight, and discourages working across teams to mitigate risk to the firm because doing so would be 'more work for us.'"  Williams requested that, inter alia, the Bank investigate and correct the legal violations and review regulatory disclosures to ensure that there were no material misstatements when reporting to regulators.

64.     In April 2019, JPMorgan fired Bridgeford. Additionally, JPMorgan purportedly transferred Ross to another project; HR told Williams that Ross would no longer have responsibilities for the TPI program. As set forth below, this was not true.

65.      In April 2019, JPMorgan appointed two Executive Directors, including Laferriere, as interim Co-Heads of GACC to replace Bridgeford. At this time, Williams began reporting to Laferriere (who had been the Head of EMEA GACC before completing her transition to Global Head of GACC).

66.     Under Laferriere, there continued to be serious problems with the Bank's Anti-Corruption program as described above.

67.     Between April and October 2019, Williams complained to, among others, (1) Employee Compliance; her supervisor Laferriere; a GACC Vice President; and Laferriere's supervisor, who was the Deputy Global Head of Employee Compliance; (2) JPMorgan HR; and (3) Legal, including the Executive Director and Assistant General Counsel in GIRE (which is the JPMorgan whistleblower team).  As Williams had done previously, Williams complained about, inter alia, the Bank's deficient internal controls; failure to keep accurate and reasonably detailed

books and records; violations of the NPA and the SEC Order; and misrepresentations to government agencies and regulators.

<u>The Bank Tries to Thwart Williams from Pursuing Her Complaints</u>

68.     In response to Williams's protected activities, the Bank attempted to stop her from pursuing her complaints and thwart her efforts to fix what she believed to be unlawful conduct.

69.     Sometimes Williams's managers and others were dismissive of her efforts and refused to take steps because it would be too much work and/or the efforts required were purportedly outside the scope of their jobs.

- For example, in or around August 2018, in response to Williams's concerns, Williams's then supervisor, Ross, said that JPMorgan did not want detailed TPI policies and procedures because having them would render the Bank more vulnerable to accusations that it failed to comply with internal rules. Ross also warned Williams against inquiring further into economic sanctions screening deficiencies because it was not part of her job and would require too much work for the group.

- Also, Williams protested inaccurate reports that the Bank submitted to the UK regulator the FCA in January 2019 and August 2019. In sum and substance, each manager told her that the problems with the report were outside the purview of their responsibilities and that the GACC EMEA team would deal with them.

- Also, in or around October 2018, Ross and Bridgeford told Williams that her concerns about the TPI and other Anti-Corruption Compliance programs were unhelpful.

20

70.    On other occasions, managers and others were hostile towards Williams when she complained and warned her not to proceed because she would upset senior leadership. In particular, Ross was frequently aggressive and abusive in response to Williams's compliance complaints.

- For example, in September 2018, with Bridgeford's approval, Williams sought to escalate her concerns about the lack of sanctions screening to the Global Financial Crimes Sanctions group.  When Williams scheduled a call with the Global Financial Crimes Sanctions group and Ross to discuss the matter, Ross ordered her to cancel the phone call and insisted that they speak immediately. Ross was angry with Williams for raising this issue and yelled at Williams over the phone. Ross told Williams not to escalate the issue to the Global Financial Crimes Sanctions group because JPMorgan was "political" and because there would be too much work to fix the problems. Williams cancelled the call with the Global Financial Crimes Sanctions group.

- In September 2018, Bridgeford warned Williams that if she escalated her compliance and retaliation complaints to HR, the Bank would not view her "favorably."

- On or about November 30, 2018, following a meeting between Williams and an Employee Compliance Control Officer, Ross asked Williams if she had discussed her compliance complaints with the Employee Compliance Control Officer. Ross warned Williams to be careful about what she said to Employee Compliance Control Officer because he was known to escalate issues to Deputy Global Head of Employee Compliance before the team was comfortable with him doing so.

21

71.     GACC managers were concerned about raising compliance problems to senior management and taking steps to fix them because the Head of Employee Compliance and Commercial Banking Compliance had made clear that she was not interested in dealing with those issues.

72.     In or around June 2019, the then-new GACC EMEA Regional Head, advised Williams to remove any reference to "gap, issue, and remediation" in a draft presentation that Williams had prepared. The GACC EMEA Regional Head said to Williams that the Head of Employee Compliance and Commercial Banking Compliance would "rip off their heads" if they escalated concerns to her. When Williams described this comment to HR, HR told Williams, in sum and substance, that it "would be better for [Williams] if [she] just moved on with a fresh start with a new manager [Laferriere]."

73.     In addition, GACC attempted to cover up Williams's concerns. For example:

- Between August 2018 and March 2019, Williams attended monthly "All Hands" meetings for the senior leaders of the GACC team. Initially, before those meetings, Williams was responsible for preparing a written report concerning the TPI program. Bridgeford, Ross, and others directed Williams not to include her remediation work and compliance concerns in the presentation materials. For example, in October 2018, Ross specifically told Williams to "remove all of the remediation stuff." When Williams submitted written materials for these meetings that included problems with the Compliance programs, Ross and others edited them and removed those concerns.

- In October 2018, all JPMorgan personnel were required to complete self-evaluations. Bridgeford requested that Williams complete a self-evaluation for her

annual performance review because the Bank requires such reviews. Williams told Bridgeford that she would describe her efforts and accomplishments thus far but was afraid that Ross would delete them. Williams was worried because Ross had deleted information from the materials for the "All Hands" global meetings that were related to compliance concerns and remediation work. Bridgeford told Williams to be "precise and accurate" in her "wording" and that she should not use the word "gap" or "issue" in describing the problems Williams had identified in the TPI program. Williams raised the issue with JPMorgan's HR representatives (at Bridgeford's suggestion), who told her that her managers could not stop her from including accurate information in her evaluation. When Bridgeford learned that Williams had discussed the issue with HR, he was upset. He told Williams that she needed to improve her communication skills.

- Rather than address Williams's repeated complaints about the GACC programs during the "All Hands" meetings with the entire global team, Bridgeford relegated Williams to raising her concerns informally during a monthly working group meeting called "Opportunities and Enhancements."  Bridgeford told Williams that she would be permitted to discuss her complaints during these meetings. The Opportunities and Enhancements working group was much smaller than the group that attended the monthly "All Hands" meetings. Williams understood that Bridgeford setup these meetings to keep the real problems away from the broader group.

- Even in connection with the informal Opportunities and Enhancements working group, Bridgeford and Ross censored Williams. In Williams's November 2018

presentation materials, she used industry standard terms such as "gap," "issue," "remediation," "risk," and "enhancement." Williams's managers, including Ross and Bridgeford, were angry with her that she had used those terms. They told her that such terms should not be included within a presentation because senior management discouraged their usage and because they would be discoverable by regulators and a problem for the SEC Order and NPA disclosures. They told Williams to use euphemisms instead such as "under review" and "opportunity."

- Also, during a check-in meeting with Ross on or about January 24, 2019, Ross called Williams "insubordinate" for escalating issues during a TPI Opportunities and Enhancements meeting without his permission.

- Also, in or around January 2019, Bridgeford directed Ross to work with Williams to update TPI information in a report to the UK regulator FCA. JPMorgan corrected some of the inaccuracies that Williams highlighted in the report but not the material misrepresentations. When Williams pressed further, Bridgeford directed Williams to "let it go."

- In addition, in April 2019, the Deputy Global Head of Employee Compliance and Ross made a presentation to the Compliance team concerning the Referred Candidates (or RC) program. In the RC presentation, the Deputy Global Head of Employee Compliance and Ross explained that JPMorgan discouraged employees from documenting facts in an RC case that did not support the final decision to hire a candidate. This effort to discourage employees from reporting information violated the NPA, SEC Order, SEC rules and regulations, and provisions of Federal law relating to fraud against shareholders.

24

● Williams had similar problems after Laferriere replaced Bridgeford. In or around May 2019, Laferriere cancelled the Opportunities and Enhancements meetings and directed Williams to prepare a written presentation to Employee Compliance senior management. Williams helped create the presentation, but she refused to omit or mischaracterize important information. In particular, Laferriere and others would not allow Williams to use terms such as "gap," "issue," "remediation," and "risk" in her written presentation materials. Williams repeatedly objected to Laferriere's directives as she believed not including such information from the presentation was misleading and improper.

<u>Retaliation by the Bank</u>

74.    Following Williams's protected activities, the Bank retaliated against her.

75.    In response to Williams's protected activities, the Bank repeatedly subjected Williams to adverse actions. Over time, the Bank marginalized Williams's role at the Bank, including removing responsibilities, giving an inaccurate performance review, issuing her a written warning, and firing her.

A.    JPMorgan Gives Williams an Inaccurate
       <u>Performance Review and Removes Her Duties</u>

76.    Between late 2018 and early 2019, JPMorgan retaliated against Williams in several ways after she escalated her complaints to, <u>inter alia</u>, HR, the Head of the Code of Conduct, and the Deputy Head of Employee Compliance.

77.    For example, in or around November 2018, Williams's then-boss, Ross, removed significant responsibilities from Williams, including her work in connection with the Transactions and Investigations programs. In December 2018, Ross also removed Williams's responsibilities for the Referred Candidates program.

78.     Ross assigned most of the work that Williams had been performing for the Transactions, Investigations, and RC programs to another employee who reported to Ross (who had not made protected complaints).  As a result, by January 2019, the Bank had limited Williams's responsibilities to the TPI program.

79.     Also, in November 2018, Bridgeford was dismissive of the performance review exercise for Williams because she had recently joined the Bank; Bridgeford told Williams that she would receive a generally positive review that did not closely evaluate her performance.

80.     However, in January 2019, Williams received her annual evaluation from Ross that included negative feedback, which did not accurately describe her performance. The review, while acknowledging that many of Williams compliance concerns had "merit," criticized Williams for "imprecise" communication skills and escalating problems with the Anti-Corruption program "too aggressively." The review also erroneously accused Williams of refusing to respond to requests for assistance. In fact, Williams had stated that she was uncomfortable giving advice on a few occasions because she needed additional information and was unfamiliar with the processes at issue. The review prevented Williams from transferring to another job at the Bank.

81.     In late January 2019, Williams also learned that her managers Bridgeford and Ross were excluding her from meetings concerning the TPI program.

B.      HR Conducts an Investigation But Fails to Remedy the Problems

82.     As set forth above, Williams complained to Human Resources about the Bank's unlawful conduct, including its deficient Compliance programs and its retaliation against her. Among other concerns, Williams formally challenged her annual performance review.

83.     While HR acknowledged some concerns, the Bank failed to remedy the issues. From February to June 2019, after receiving Williams's complaints, HR supposedly conducted an internal investigation.

84.      In early June 2019, HR concluded its investigation into Williams's complaints after speaking to management, including Laferriere, Bridgeford, Ross, and the Deputy Global Head of Employee Compliance. HR representatives told Williams that the personnel changes – referring to the Bank's decision to fire Bridgeford and transfer Ross – should have resolved many of her concerns.

85.     Specifically, as to Williams's complaints concerning JPMorgan's unlawful Compliance programs and practices, HR stated that those were "management decisions," did not implicate legal obligations, and therefore the Bank would take no additional steps. As to Williams's January 2019 performance evaluation, HR stated that it would edit some of the feedback but would not change the ratings.  The ratings restricted Williams from transferring to other roles at the Bank.

86.     The retaliation continued after HR concluded its investigation in June 2019. Contrary to HR's statements, the personnel changes did not resolve the problems.  As Williams told HR, after Ross's purported transfer, he still played a leadership role for the TPI program. Moreover, although Ross was supposedly no longer responsible for the TPI program, he was acting as the TPI team lead during meetings that Laferriere had excluded Williams from attending.

87.     Also, Laferriere was not a "new" GACC manager. Laferriere had been the Head of the EMEA Anti-Corruption team when Williams had complained that the team had made false reports to government agencies and regulators.

88.     Laferriere continued Ross's retaliation against Williams. For example, beginning in June 2019, Laferriere excluded Williams from TPI program lead activities even though Laferriere had told Williams that she was program lead, the face of the TPI program, and expected her to assist with regulator and audit requests.

C.     The Bank Issues Williams a Written Warning and Fires Her

89.     On or about September 6 and 11, 2019, Williams told Laferriere, orally and in writing, that she continued to experience unlawful treatment, including exclusion, bias, and retaliation because of her, inter alia, ongoing concerns about the Bank's deficient Compliance programs and practices that she believed violated the law and her complaints that management retaliated against her for raising those concerns.

90.     While HR had closed its investigation in June 2019, HR representatives had told Williams to update them if she continued to face problems.  Accordingly, in September 2019, Williams complained to HR about ongoing unlawful conduct, including unlawful practices and retaliation against her.

91.     Ultimately, HR escalated Williams's concerns to a Human Resources Business Partner; that HR Business Partner then escalated Williams's concerns to an Executive Director, Assistant General Counsel for JPMorgan's whistleblower legal team called GIRE.

92.     On October 2, 2019, Williams submitted a written complaint alleging, among other concerns, that many of JPMorgan's Compliance practices violated the law and that, in response to those concerns, the Bank had retaliated against Williams.

93.     In October 2019, Williams also sent the HR Business Partner and GIRE Executive Director a summary of her previous complaints. Other HR representatives also provided the HR Business Partner and GIRE Executive Director with copies of Williams's previous complaints.

94.     On or about October 7, 2019, Williams met with the HR Business Partner and GIRE Executive Director for approximately two hours. During that meeting, Williams discussed in depth, inter alia, her investigation and opposition to the Bank's practices and conduct in connection with the Bank's Anti-Corruption, Sanctions, and Anti-Money Laundering programs. Williams explained that she believed that the programs failed to comply with laws, regulations, and rules, including, but not limited to, the NPA, SEC Order, SEC rules and regulations, and provisions of Federal law relating to fraud against shareholders.

95.     Fewer than three weeks after Williams's two-hour meeting with the HR Business Partner and GIRE Executive Director, on or about October 24, 2019, JPMorgan placed Williams on a "Written Warning" for allegedly unprofessional behavior and unsatisfactory performance.

96.     Many of the Bank's criticisms were untrue. The Written Warning incorrectly stated that Williams had received similar criticism previously. This was not accurate as Williams's manager, Laferriere, had not provided any such feedback. For example, in or around September 2019, Laferriere and Williams met for a mid-year review discussion. During the meeting, Laferriere did not have an agenda and did not provide Williams with any substantive feedback. Instead, Laferriere primarily focused on asking Williams what she would like to accomplish for the rest of the year and what she would like to improve. Laferriere also inquired into Williams's job search and offered to help her with finding another role.

97.     In addition, some of the negative feedback in the Written Warning related directly to William's protected complaints. For example, the warning admonished Williams for objecting to presenting information to Compliance senior management that was inaccurate and intended to mislead others concerning Compliance issues.

98.     The Deputy Global Head of Employee Compliance (and an HR representative) issued Williams the Written Warning and the Deputy Global Head of Employee Compliance signed it.  On information and belief, it was atypical for a senior manager such as the Deputy Global Head of Employee Compliance, and not Williams's direct manager, to issue and sign the Written Warning.

99.     In addition, some of the criticisms in the Written Warning contradicted the feedback Williams previously received, including in her 2019 360 reviews.  For example, the Written Warning stated that Williams purportedly showed "a consistent inability or unwillingness to collaborate with others on the team or to receive constructive feedback in a positive manner" and engaged "in behavior that [was] intimidating and dismissive of others."  In contrast, in the 360 reviews, colleagues stated that Williams was "incredibly knowledgeable and very thorough[,]" "very responsive[,]" and "easy and pleasant to work with[]"; that she had "excellent written and verbal communication skills"; and that she had a "commitment to excellence and teamwork[.]"

100.    Also, the Written Warning was effective for 60 days from October 24 to December 23, 2019 and the HR representative who issued Williams the Written Warning told Williams that she had one week to submit a response. However, JPMorgan failed to give Williams an opportunity to improve within the timeframe specified in the Written Warning.  Nor did the Bank provide Williams with a chance to respond to the allegations against her.

101.    Less than one week after the Written Warning, on October 30, 2019, JPMorgan fired Williams effective November 15, 2019.  The Bank prohibited Williams from accessing systems and returning to the office after October 30, 2019.

102.    The Bank purportedly fired Williams because her performance had not improved pursuant to the Written Warning. To the contrary, JPMorgan fired Williams because she engaged

in protected whistleblower activity under SOX by investigating, complaining about, and exposing practices and behaviors that she believed constituted violations of federal laws, regulations, rules, and internal policies, including, but not limited to, SEC rules and regulations and provisions of Federal law relating to fraud against shareholders.

103.    On October 31, 2019, JPMorgan sent Williams a proposed severance agreement that included a general release of her legal claims.  Williams did not sign the agreement.

104.    Not satisfied with simply firing Williams, JPMorgan also interfered with her job search after her employment at the Bank ended, including by failing to confirm Williams's employment in a timely manner.  As a result, a potential employer withdrew its offer to Williams.

<u>FIRST CAUSE OF ACTION</u>

<u>Sarbanes-Oxley Whistleblower Retaliation</u>

105.    Plaintiff repeats and realleges paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    Plaintiff engaged in protected activity or conduct under SOX.

107.    Defendant had actual or constructive knowledge of this protected activity.

108.    Plaintiff suffered an adverse personnel action.

109.    Plaintiff's protected activity was a contributing factor in defendant's decision to take an adverse personnel action against her.

110.    As a result of defendant's conduct, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

    a.  Declaring that the acts and practices complained of herein violate SOX;

    b.  Enjoining and permanently restraining these violations of SOX;

    c.  Directing defendant to take affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff;

    d.  Directing defendant to place plaintiff in the position she would have occupied but for defendant's retaliatory treatment, and making her whole for all the earnings and benefits she would have received but for defendant's retaliatory treatment, including, but not limited to, wages, bonuses, and other lost benefits;

    e.  Directing defendant to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

    f.  Awarding plaintiff reasonable attorneys' fees and costs;

    g.  Awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

    h.  Granting plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

    i.  Granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:        New York, New York
              November 11, 2021

                                        VLADECK, RASKIN, & CLARK, P.C.

                               By:      */s/ Jeremiah Iadevaia*
                                        _____
                                        Jeremiah Iadevaia
                                        Kathleen C. Riley
                                        Attorneys for Plaintiff
                                        565 Fifth Avenue, 9th Floor
                                        New York, New York 10017
                                        (212) 403-7300