UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAQUALA WILLIAMS, | Case No. 1:21-cv-09326-JSR |
| Plaintiff, | *Electronically filed* |
| v. | Oral Argument Requested |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
<u>JPMORGAN CHASE BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT</u>**

**MORGAN, LEWIS & BOCKIUS LLP**
Thomas A. Linthorst
Tyler J. Hill
Carlyle Edwards-Balfour
502 Carnegie Center
Princeton, New Jersey 08540
Phone: (609) 919-6642
Fax: (609) 919-6701

*Attorneys for Defendant,
JPMorgan Chase Bank, N.A.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................................... 3

A.   Plaintiff Was Employed In JPMorgan's Anti-Corruption Compliance
     Department.......................................................................................................... 3

B.   Plaintiff Exhibited Performance Deficiencies Early In Her Employment........... 3

C.   Plaintiff Complained About Work Assignments, Her Managers, Team
     Culture, The Annual Review Process, And The Lack Of Early Dismissals......... 4

D.   Plaintiff's Performance and Behaviors Continued to be Deficient...................... 6

E.   Plaintiff Received A 2018 Annual Review That Identified Performance
     Deficiencies Consistent With Feedback Received About Plaintiff. ..................... 6

F.   Plaintiff Challenged Her 2018 Performance Review........................................... 7

G.   GACC Underwent A Change In Leadership. ...................................................... 8

H.   Plaintiff Submitted a Written Complaint That was Investigated. ........................ 8

I.   Co-workers Complained about Plaintiff's Performance and Behavior. .............. 8

J.   The First Internal Review Concluded, And Investigators Met With
     Plaintiff. .............................................................................................................. 9

K.   Singh Complained to Human Resources About Plaintiff. ................................. 10

L.   Plaintiff Submitted A Second Internal Complaint, Which Was
     Investigated........................................................................................................ 10

M.   Plaintiff's Performance and Behavior Continued To Be Deficient. .................. 12

N.   Plaintiff's 2019 Review Reflected The Performance Issues Co-workers
     Reported............................................................................................................. 13

O.   Plaintiff Received A Written Warning After Her Performance And
     Conduct Did Not Improve. ............................................................................... 13

P.   Following Receipt Of The Written Warning, Plaintiff Continued To
     Demonstrate The Same Deficiencies, And Her Employment Was
     Terminated. ....................................................................................................... 14

Q.   Shortly After The Termination of Her Employment at JPMorgan, Plaintiff
     Started a High-Paying Job at Wells Fargo......................................................... 15

R.   OHSA Investigated And Dismissed Plaintiff's SOX Retaliation Claim. .......... 15

SUMMARY JUDGMENT STANDARD ................................................................................ 16

ARGUMENT ......................................................................................................................... 16

# TABLE OF CONTENTS
(continued)

**Page**

I.    The Alleged Adverse Actions Occurring Before And After The Termination Of Plaintiff's Employment Were Not Timely Exhausted Before OSHA. ............................ 17

II.   Plaintiff's Alleged Protected Conduct Was Not A Contributing Factor To Any Alleged Adverse Action. ................................................................................ 18

     A.    Rather Than Retaliate, JPMorgan Devoted An Extraordinary Amount of Resources to Considering and Investigating Plaintiff's Complaints or Concerns. ............................................................................... 19

III.  JPMorgan Has Demonstrated By Clear And Convincing Evidence That It Would Have Terminated Plaintiff's Employment Regardless Of Any Protected Activity. ........ 21

IV.  The Court Should Grant Summary Judgment To JPMorgan On Plaintiff's Allegation of Post-Employment Retaliation. ................................................... 23

CONCLUSION .......................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Balut v. Loral Elec. Sys.*,
    988 F.Supp. 339 (S.D.N.Y. 1997) ...................................................................16

*Bechtel v. Admin. Review Bd.*,
    710 F.3d 443 (2d Cir. 2013)............................................................................16

*Celotex v. Catrett*,
    477 U.S. 317 (1986)........................................................................................16

*Daly v. Citigroup Inc.*,
    939 F.3d 415 (2d Cir. 2019)............................................................................17

*In the Matter of Galinsky v. Bank of America, Corp.*,
    2012 WL 5818127 (ARB Oct. 31, 2012)........................................................22

*Giurovici v. Equinix, Inc.*,
    2008 WL 7835842 (ARB Sept. 30, 2008) .......................................................22

*In the Matter of Hendrix v. American Airlines, Inc.*,
    2004 WL 5345479 (ALJ Dec. 9, 2004) ..........................................................22

*Jenkins v. New York State Banking Dept.*,
    2010 WL 2382417 (S.D.N.Y., 2010)...............................................................21

*Luxenberg v. Guardian Life Ins. Co.*,
    2004 WL 385116 (S.D.N.Y., 2004).................................................................21

*Pardy v. Gray*,
    2008 WL 2756331 (S.D.N.Y. 2008)................................................................22

*Potts v. Center for Excellence in Higher Education, Inc.*,
    908 F.3d 610 (10th Cir. 2018) ........................................................................23

*Slattery v. Swiss Reinsurance America Corp.*,
    248 F.3d 87 (2d Cir., 2001).............................................................................21

*Tonra v. Kadmon Holdings, Inc.*,
    405 F. Supp. 3d 576 (S.D.N.Y. 2019).............................................................16

**Statutes**

18 U.S.C. § 1514A (b)(2)(c) ...........................................................................21

18 U.S.C. § 1514A(b)(2)(D) ...........................................................................17

Sarbanes-Oxley Act ............................................................................. *passim*

**Other Authorities**

29 C.F.R. § 1980.104(e)(1)-(2) ......................................................................18

Fed. R. Civ. P. 56(c) .......................................................................................16

## PRELIMINARY STATEMENT

Plaintiff Shaquala Williams was employed as a compliance professional in the Third Party Intermediary ("TPI") group of JPMorgan Chase Bank, NA's ("JPMorgan") Global Anti-Corruption Compliance ("GACC") department from July 30, 2018 to November 15, 2019. Plaintiff's employment was terminated based on chronic deficiencies in her performance and behavior, which were identified and documented throughout her employment by numerous managers and co-workers.   Indeed, a more junior co-worker complained that Plaintiff's unprofessional interactions left him "feeling humiliated," was "causing him emotional and physical distress," and "was verbally abusive to him," which "was taking a psychological toll on him outside of work."  Plaintiff's deficiencies were repeatedly documented and addressed with her, but she refused to acknowledge that she had any need to improve and therefore, not surprisingly, she did not improve.

The efforts to address Plaintiff's performance and behavioral deficiencies culminated in a Written Warning delivered on October 24, 2019, which notified her that her employment could be terminated unless she demonstrated "immediate and sustained improvement."  By Plaintiff's own admission, however, upon receiving the warning, she did not accept the feedback, she did nothing to change her performance or behavior, and she had no intention of doing so.  When Plaintiff's manager saw that Plaintiff had no intention of improving, and continued immediately after the warning to exhibit the same deficiencies that had just been addressed, the decision was made to terminate Plaintiff's employment.

Plaintiff alleges that her employment was terminated in retaliation for protected complaints in violation of the Sarbanes-Oxley Act ("SOX").  There is no dispute that Plaintiff complained about a wide variety of issues from the start of her employment and consistently thereafter.  She

complained about her managers, her performance review, lack of early dismissal before a holiday weekend, seating assignments, not being invited to meetings for managers with direct reports (of which Plaintiff had none), and a host of other issues.  Because Plaintiff worked in anti-corruption compliance, and one of her responsibilities was specifically to propose changes or enhancements to the TPI program, some of her complaints involved compliance issues that had legal implications. Far from retaliating against Plaintiff, however, JPMorgan devoted an extraordinary amount of resources to considering, understanding, investigating, and responding to Plaintiff about any concerns she raised.  Plaintiff had regular meetings and communications with management several levels above her, she was commended for raising issues, and when Plaintiff submitted more formal complaints, JPMorgan twice appointed investigators to review Plaintiff's concerns – investigations that spanned months and involved interviews with dozens of witnesses.  Nothing about Plaintiff's complaints, however, excused her from the legitimate consequences of her performance and behavioral deficiencies, or gave Plaintiff license to act rude and unprofessional to coworkers, push her work onto others, or refuse to collaborate with key stakeholders.

Summary judgment should be granted to JPMorgan because: (1) this Court lacks jurisdiction to hear Plaintiff's claims with respect to any alleged adverse actions prior to, or subsequent to, the termination of Plaintiff's employment because those alleged adverse actions were not the subject of any timely administrative complaint; (2) there is no genuine issue of material fact sufficient to permit a finding that any alleged protected activity was a contributing factor in the termination of Plaintiff's employment and, in any event, JPMorgan has demonstrated by clear and convincing evidence that it would have taken the same adverse actions in the absence of any alleged protected activity; and (3) Plaintiff's allegation of post-employment retaliation also fails because SOX does not cover post-employment actions and, in any event, there is no evidence

of post-employment retaliation by JPMorgan.  For all of these reasons, JPMorgan respectfully requests the Court grant summary judgment in its favor.

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

**A.    Plaintiff Was Employed In JPMorgan's Anti-Corruption Compliance Department.**

On July 30, 2018, Plaintiff commenced employment as a Compliance Manager with JPMorgan's Global Anti-Corruption Compliance department.  Statement of Undisputed Material Facts ("SUMF") ¶ 10.  GACC oversees JPMorgan's Anti-Corruption Compliance Program through various anti-corruption compliance workstreams.  *Id.* ¶ 6.  Plaintiff was hired into the third-party intermediary ("TPI") work stream, reporting to Garrett Ross, who led the TPI work. *Id.* ¶¶ 8-10.  A TPI is an individual or entity engaged to interact with third parties on JPMorgan's behalf to help obtain or retain a commercial benefit or government or regulatory actions or approvals.  *Id.* ¶ 12.  The TPI workstream manages the risk associated with TPIs through monitoring compliance, pre-clearance and periodic reviews, issuing policy violation notices, and handling firm-wide reporting of TPI-related data.  *Id.*

At all relevant times, Plaintiff understood that JPMorgan maintains, and regularly trains its employees on, a Code of Conduct governing its employees' compliance with applicable policies, regulations, and laws, which includes a complaint procedure and prohibits retaliation for making a complaint under the policy.  *Id.* ¶¶ 1-3.  The Code further requires employees to "[t]reat others with dignity," and prohibits "inappropriate or abusive conduct."  *Id.* ¶ 4.

**B.    Plaintiff Exhibited Performance Deficiencies Early In Her Employment.**

Plaintiff's responsibilities included, among other things, identifying opportunities for improvement in JPMorgan's TPI program.  Early on, however, Ross observed that Plaintiff at times proposed revisions to the program without thinking through the issue, or without providing

a solution to the issue.  In September 2018, Plaintiff updated Ross on discussions regarding one suggestion she had, and when Ross asked how her proposal could be done, Plaintiff responded, "not my problem."  *Id.* ¶ 14.  Ross explained that it would be their problem because they owned the system at issue, but Plaintiff replied that she would "let tim [Bridgeford] have that battle … tim vs head of sanctions."  *Id.*  Bridgeford was Ross' manager, and Ross did not believe it was appropriate for Plaintiff to raise an issue without thinking through its resolution, and to leave her second-level manager to "have that battle."  *Id.*

Ross also counseled Plaintiff to improve her performance in certain respects based on his observations.  On September 28, 2018, Plaintiff approved a draft of an internal e-bulletin on TPIs for circulation without Ross' review or approval.  Ross coached Plaintiff, stating: "Going forward, can you please respond to my emails when they pose questions rather than taking action before we touch base?"  *Id.* ¶ 15.  On October 25, Plaintiff failed to respond to Ross' request to update a GACC report, and on November 6, Plaintiff ignored Ross' request to review a spreadsheet that was created in connection with one of GACC's controls and then, upon follow up by Ross, declined to review the spreadsheet as requested.  *Id.* ¶¶ 17-18.

## C.    Plaintiff Complained About Work Assignments, Her Managers, Team Culture, The Annual Review Process, And The Lack Of Early Dismissals.

Within a month of her employment, Plaintiff complained to her second-level manager, Bridgeford, about not getting credit for work assigned to her.  *Id.* ¶ 19_.  She also took exception to Ross' management, and, within the first two months of her employment, met with Bridgeford three times to complain about Ross and the "team culture," and proposed that she no longer report to Ross.  *Id.* ¶¶ 19, 21, 22.  Plaintiff started sending emails to herself purporting to characterize conversations she had with Ross and others.  *Id.* ¶ 22.

4

On October 26, 2018, Plaintiff had a fourth meeting with Bridgeford during which she expressed concern about the annual review process. *Id.* ¶ 24. Plaintiff thereafter had a fifth meeting with Bridgeford, at which he asked Plaintiff to hold "Opportunities and Enhancement" meetings so that Plaintiff could have a dedicated platform specifically to present to management any TPI, or other issues she identified or proposals she wished to make. *Id.* ¶ 25.

As noted, Plaintiff was immediately unhappy with Ross, and it did not take long for her to become dissatisfied with Bridgeford as well. On November 1, 2018, Plaintiff emailed Bridgeford and asked if she was permitted to include in her self-assessment for the annual review comments on "gaps that I identified in the TPI program and the remediation efforts that I am performing?," to which Bridgeford responded, "Of course, this is your assessment of your work"; however, he indicated that the word gap suggested that something is missing, and added: "From what you described to me, sounded like enhancements or modifications." *Id.* ¶ 27. Plaintiff responded that she wanted to capture all of her work in her review so that it could be considered "instead of being 'invisible work.'" *Id.* Bridgeford directed Plaintiff to "connect with HR" for any questions about the review process. *Id.*

Instead of simply seeking advice from HR as to the appropriate content of her self-evaluation, Plaintiff told HR that her managers were "prohibit[ing] [her] from adding information to [her] review," and then reported back to Bridgeford that HR advised that he is not allowed to do that. *Id.* ¶ 28. Bridgeford sent a follow up email clarifying that, "[p]er our discussions, I have not in any way told you cannot put down your work in your words in your performance assessment," and added: "However, like all employees, I would expect the performance assessment to be accurate and precise in its wording." *Id.* Plaintiff later wrote she was concerned

that not being able to include "the issues and remediations efforts" in her self-review "would make it difficult to justify receiving [her] bonus or promotions[.]"  *Id.* ¶ 29.

On November 14, 2018, Plaintiff met with her third-level manager, Jennifer Boyle-Devine, to discuss both Bridgeford and Ross.  Among other things, Plaintiff complained that several employees had left early on a Friday prior to a holiday weekend.  *Id.* ¶ 30.

### D.   Plaintiff's Performance and Behaviors Continued to be Deficient.

In the Fall 2018, feedback on Plaintiff's performance was provided through JPMorgan's 360° peer review program.  One manager noted concern that Plaintiff was "focusing on potential changes to the third-party intermediary program that were not necessarily helpful."  *Id.* ¶ 32. Another manager welcomed Plaintiff to make suggestions for changes to the program, but encouraged her to think through her ideas and potential solutions before raising them:

> Quala has [] raised items before fully fleshing them out which leads to confusion across various team members. Similarly, Quala has at times expressed desire to prematurely escalate before having fully baked points/recommendations. In the interest of collaborating and communicating more effectively, I would recommend Quala take more time to organize her thoughts, how to communicate them, and when to communicate them (after sufficiently fleshing them out).

*Id.* ¶ 33.  A co-worker echoed that sentiment by commenting in his 360° feedback that Plaintiff should "[p]rovide potential solutions to issues found as opposed to just detecting a problem."  For Plaintiff's 2018 Performance Calibration Worksheet, Ross noted that Plaintiff "[n]eeds to focus on better communication with Compliance colleagues."  *Id.* ¶ 35.

### E.   Plaintiff Received A 2018 Annual Review That Identified Performance Deficiencies Consistent With Feedback Received About Plaintiff.

In early January 2019, Plaintiff received her annual review for performance year 2018, which reflected the poor communication and teamwork Plaintiff had exhibited during her first five months on the job.  *Id.* ¶¶ 37-42.  Although Plaintiff received a meets expectations rating of On Track for the Business Results and the Client / Customer / Stakeholder categories, she received a

below expectations rating of Growth Area for Teamwork and Leadership. *Id.* Ross credited Plaintiff for "identifying areas of enhancement [for the TPI program]" and added, "I believe that many of her recommendations will ultimately benefit GACC and the firm." With regard to Teamwork and Leadership, Ross wrote: "This is an area of improvement for Quala. I have at times found her to be resistant to providing assistance." *Id.* In the Overall Performance Summary section of the review, Ross summarized: "Where Quala could seek to improve is in her collaboration and communication. … Similarly, she should seek to cultivate stronger relationships with other colleagues, and be more mindful of the way she presents issues." *Id.*

### F. Plaintiff Challenged Her 2018 Performance Review.

On January 18, 2019, Plaintiff met with Boyle-Devine again to inform her that she intended to challenge her review. *Id.* ¶ 45. Plaintiff also requested permission to seek to transfer to another role. *Id.* ¶ 43. JPMorgan generally prohibits employees from pursuing transfers within the first year of their employment, but Boyle-Devine granted Plaintiff an exception. *Id.* Thus, within six months of her hire, Plaintiff had stated her intention to leave the group, and she began applying for other roles inside and outside of JPMorgan. *Id.* ¶ 44.

The same day, Plaintiff contacted Employee Relations VP Aimee Dahlgren and requested a meeting to discuss Plaintiff's challenge of her annual review. *Id.* ¶ 46. On February 15, 2019, Dahlgren informed Plaintiff that her (Dahlgren's) review identified support for the ratings and performance assessment, which would stand. *Id.* ¶ 47. Dahlgren and Ross agreed, however, that "for clarification," the following emphasized words would be inserted in the Manager Comments section under Teamwork and Leadership: "I counseled her to be more thoughtful in the way she is communicating, as the message she sent read ***to me*** as an unwillingness to help." *Id.* ¶ 49. On February 21, 2019, Plaintiff wrote to Dahlgren to express her continued disagreement with the review. *Id.* ¶ 50.

### G.     GACC Underwent A Change In Leadership.

In April 2019, JPMorgan eliminated Bridgeford's role, reassigned Ross to a different workstream, and appointment of Melissa Laferriere as co-head of GACC responsible for, among other workstreams, TPI.  *Id.* ¶ 52.  As a result, Laferriere became Plaintiff's her new manager.  *Id.* ¶ 53.  Despite having a new manager, however, Plaintiff still wanted to move out of her TPI role, and advised Laferriere of that fact.  *Id.* ¶ 54.

### H.     Plaintiff Submitted a Written Complaint That was Investigated.

On April 9, 2019, Williams submitted a 14-page document that raised various issues regarding her employment, including her annual review and certain alleged business practice issues.  *Id.* ¶ 55.  Plaintiff wrote that she was "escalating these concerns through HR to achieve," among other alleged objectives, a "[c]orrected annual review[,]" the "ability to work from a different location for part of the week[,]" and to have Ross "[h]eavily supervise[d] . . . in his new role[.]"  *Id.*   To investigate these concerns, JPMorgan appointed investigators who conducted more than a dozen interviews, and repeatedly communicated with Plaintiff during the course of the review (the "First Internal Review").  *Id.* ¶ 56.

### I.     Co-workers Complained about Plaintiff's Performance and Behavior.

Shortly after Laferriere began supervising Plaintiff, she began receiving complaints about Plaintiff from other managers and co-workers.  In May 2019, GACC Associate James Economou told Laferriere: "I sent Quala an email ahead because I didnt [sic] feel comfortable going to her desk … she doesnt [sic] want anyone on the team talking to her so I would like to keep it on email basis going forward if thats [sic] OK."  *Id.* ¶ 58.  In June 2019, Compliance Manager Maria Ouli and Compliance Associate Rajib Banerjee expressed to Laferriere that Plaintiff did not seem to want to work with them on the project they had been assigned, and that "interacting with [Plaintiff] was difficult."  *Id.* ¶ 59.

On June 17, 2019, Laferriere had a catch-up meeting with Puneet Singh, an Associate on the TPI team, at which he complained of Plaintiff's rude behavior and reported that his interactions with Plaintiff left him "feeling humiliated." Singh expressed that "he feels like [Plaintiff] is talking down to him and looking to humiliate him every time they speak." *Id.* ¶ 60.

Laferriere had asked Plaintiff to confer with Singh on re-allocating workloads and responsibilities, but Singh reported that Plaintiff again refused to engage with him, and belittled him. Singh told Laferriere that Plaintiff was "causing him emotional and physical distress." *Id.* ¶ 66. Laferriere documented her exchanges with Singh that day, reporting: "[Singh] noted that Quala was verbally abusive to him again and that he no longer felt comfortable speaking with her one to one. He stated that working with her was taking a psychological toll on him outside of work." *Id.* ¶ 67. Laferriere later met with GACC Associate Andrew Norris, who corroborated that Plaintiff "put [Singh] down in meetings all the time … called [Singh] unprofessional repeatedly in meetings, even when he was only asking valid questions … was rude to [Singh] and, although she seemed to have trouble communicating with a lot of team members, her relationship with [Singh] was particularly bad … [and] …. it had made working on TPI related projects very uncomfortable." *Id.* ¶ 68.

**J.     The First Internal Review Concluded, And Investigators Met With Plaintiff.**

In June 2019, the investigators who conducted the First Internal Review met with Plaintiff to summarize their conclusions. The investigation did not substantiate Plaintiff's allegations of wrongdoing, but did identify an opportunity for Ross to improve his communication skills with Williams, and Boyle-Devine coached Ross on this point. *Id.* ¶¶ 69-70. The investigation also concluded that Plaintiff's 2018 performance review could have been more precise in explaining that Plaintiff needed to do more to understand issues before they are escalated, and certain of the language was revised, but the ratings remained the same. *Id.* ¶ 71.

### K.    Singh Complained to Human Resources About Plaintiff.

On August 1, 2019, Singh reported to HR how Plaintiff "speaks down to him and refuses to work with him on projects," refused to engage with him in meetings, and intentionally excluded him from emails. *Id.* ¶ 72. Although Singh had sought to work out this issue with Plaintiff, he explained that Plaintiff was "not responsive to his concerns" and that he continued to feel "friction" with Plaintiff despite his numerous attempts to engage her. *Id.* ¶¶ 72-73.

On August 6, 2019, Singh told Laferriere about an incident in which Plaintiff acted "hostile" toward him, and said: "I would rather avoid having any further one-on-one discussions with [Plaintiff] from now on. I have tried more than enough times to work things out with her and have only received these kind of hostile responses, every single time… I do not think I can keep dealing with this hostility any longer." ¶ 75. Singh emphasized: "I have been facing similar issues with her since my first month of joining the team. I discussed these incidents on real time basis with Garrett [Ross] and Tim [Bridgeford] at the time and also raised some of these with you, during our earlier discussions." ¶ 76. Laferriere stated she would address Plaintiff's teamwork and leadership skills at their upcoming Mid-year Check-in meeting. *Id.* ¶ 77.

On August 28, 2019, Laferriere held the Mid-year Check-in meeting with Plaintiff. Laferriere documented that she advised Plaintiff that "the tone she uses with other team members and the way that she treats others is problematic," and that she "often engages in the types of behaviors towards others that she has complained about when she believes they are directed at her." *Id.* ¶ 78. Additionally, Laferriere documented discussing with Plaintiff "the importance of collaboration and the ability to work together as a team." *Id.*

### L.    Plaintiff Submitted A Second Internal Complaint, Which Was Investigated.

On September 6, 2019, Plaintiff complained to Laferriere about not being invited to management meetings held by Laferriere and GACC co-Head Brad Carso. *Id.* ¶ 79. Laferriere

emailed Plaintiff to confirm that she was not invited to those meetings because they were limited to those who have direct reports, which Plaintiff did not. *Id*. Plaintiff sent a lengthy response disputing Laferriere's summary of their discussion. *Id.* ¶ 80. She also claimed that "[l]ast week's meeting is not the first escalation that I made to you with regard to exclusion, bias and retaliation." *Id*.

JPMorgan appointed new investigators to review Plaintiff's new allegations (the "Second Internal Review"). *Id.* ¶ 81. A two-hour meeting was held with Plaintiff, and over twenty witnesses were interviewed. *Id*. Plaintiff's new complaint alleged certain issues relating to her employment – namely, that Laferriere prevented her from including certain projects/tasks as part of her annual performance management goal-setting, that the seating assignments within GACC could be seen as evidencing racial bias, and that Plaintiff was being retaliated against for having raised prior concerns. *Id.* ¶ 82.

None of these allegations had merit. *Id.* ¶ 83. With respect to the first issue, in June 2019, during the annual goal-setting process for its employees, Laferriere provided comments on Plaintiff's draft list of goals and suggested that Plaintiff focus less on "business as usual" items, and more on items that were not simply day-to-day tasks. *Id.* ¶ 84. Rather than accept this feedback, Plaintiff complained that Laferriere's advice not to focus on "business as usual" items meant that she was "told to remove items that [she] accomplished[.]" *Id.* ¶¶ 82-89. In addition, there was no evidence that seating assignments were based on race, or that Plaintiff was retaliated against for having raised her prior complaints. *Id.* ¶¶ 90-91.

Plaintiff also raised certain business practices issues. *Id.* ¶ 92. The investigation into the HR issues concluded around October 2019, but the investigation into the business practices issues extended until March 2020. *Id.* ¶ 93.

**M.      Plaintiff's Performance and Behavior Continued To Be Deficient.**

On August 26, 2019, Plaintiff attempted to unilaterally reassign her responsibilities for a working group meeting to Compliance Officer Laura Angulo, which required Laferriere to step-in and remind Plaintiff that she still was responsible for that project.  *Id.* ¶ 94.  On October 2, 2019, Chris Punke, a GACC Manager, conveyed to Laferriere that, on a call he was attending with Ouli and Plaintiff, interactions between Plaintiff and Ouli were "getting out of hand[.]" *Id.* ¶ 95.  Punke repeated these concerns in his 360° feedback for 2019, in which he reported: "I've found it challenging to work with and participate in calls with Quala. At times her tone and approach comes across very aggressive, condescending and counterproductive." *Id.*

On October 4, 2019, Punke wrote to Laferriere with a "[g]ood example which supports my 360° feedback[.]'"  Ouli, who lives in the United Kingdom (UK), had asked Plaintiff to send Laferriere a document in advance of an upcoming call because it was late in the day (in the UK) on this Friday and Ouli had to leave the office.  Plaintiff refused.  Ouli replied, "Please if you can forward separately and I will attach your email to the invite on Monday."  Plaintiff then copied in their manager, Laferriere, and wrote: "It seems that Maria is unable to forward the presentation materials for Monday to you so I am attaching it to this message on her behalf."  *Id.* ¶ 97.

In Banerjee's 2019 360° feedback of Plaintiff, he reported that Plaintiff "should aim to work on her teamworking skills and acknowledge the value in feedback provided by other[s]." *Id.* ¶ 101.

A Compliance Control Officer wrote in his 2019 360° feedback that his interactions with Plaintiff "left [him] with concerns about 1) the level of critical thought she applied before deciding to raise a matter, 2) the level of engagement she had with her management prior to deciding to raise a concern and 3) the factual accuracy [sic] of details stated in conversations related to raised concerns." *Id.* ¶ 102.

### N.    Plaintiff's 2019 Review Reflected The Performance Issues Co-workers Reported.

By October 2019, the year-end performance review process was underway and on October 3, 2019, Laferriere submitted a Performance Calibration Committee Worksheet that assigned Plaintiff a below-expectations rating of Growth Area for two of the three performance categories. *Id.* ¶ 105.  With respect to Teamwork and Leadership, Laferriere explained: "Quala's teamwork and leadership skills were raised as areas of development during both her 2018 year-end review and her 2019 mid-year check-in.  However, Quala has not shown material growth in either area." *Id.* ¶ 107.  Regarding Plaintiff's Growth Area rating for the Client / Customer / Stakeholder category, Laferriere documented reports by co-workers that "(i) Quala did not value or take into account input from other SME stakeholders; (ii) Quala had an adverse reaction to any views that differed from hers; and (iii) Quala had difficulty communicating her ideas across to others in an understandable and clear way." *Id.* ¶ 109.  The 2019 performance review was never delivered because Plaintiff's employment was subsequently terminated. *Id.* ¶ 109, n.4.

### O.    Plaintiff Received A Written Warning After Her Performance And Conduct Did Not Improve.

On October 24, 2019, JPMorgan placed Plaintiff on a Written Warning due to her "unprofessional behavior and unsatisfactory performance."  The Warning described the performance issues spanning 2019, and stated: "Quala has shown a consistent inability or unwillingness to collaborate with others on the team or to receive constructive feedback in a positive manner. Rather, she engages in behavior that is intimidating and dismissive of others[.]" The Warning concluded: "Despite the feedback provided throughout the year, Quala continues to exhibit significant behavioral and performance deficiencies, which have negatively impacted the employee experience, including the morale of the Anti-Corruption Compliance team broadly." *Id.*

¶ 110.  The Warning stated that Plaintiff was expected to "[t]reat others respectfully, including by adjusting the tone, approach and wording she uses to communicate."  *Id.* ¶ 116.

The Written Warning instructed Plaintiff that "[i]mmediate and sustained improvement is required."  *Id.* ¶ 111.  It further advised her that "[y]ou may receive additional corrective action up to and including termination of employment if your performance continues to not meet expectations, if there is not immediate and sustained improvement or if another performance issue arises."  *Id.*  Boyle-Devine and a HR representative met with Plaintiff to deliver the Written Warning.  *Id.* ¶ 112.

### P.    Following Receipt Of The Written Warning, Plaintiff Continued To Demonstrate The Same Deficiencies, And Her Employment Was Terminated.

Plaintiff, however, did not agree with or accept any of the feedback identified in the warning, she did not make any such changes following the warning despite the need to make "immediate and sustained improvement" to avoid further discipline, nor did she intend to.  *Id.* ¶ 113.  Not surprisingly, then, immediately after the warning, Laferriere noticed that Plaintiff appeared to have no intention to improve on the issues identified in the warning, and continued to do the same things that were just addressed in the warning.  *Id.*  ¶¶ 114-117.  For example, having just been warned that she needed to improve her collaboration and refrain from engaging in "intimidating and dismissive" conduct towards others on the team, Laferreire received feedback from another team member that "he is hesitant to interact with [Plaintiff] face to face, 'she's going to jump down my throat if I ask her to clarify/stop sending stuff.'"  *Id.* ¶¶ 115-116.

Laferriere spoke with Boyle-Devine and HR about what she saw in the days following the warning, and the decision was made to terminate Plaintiff's employment for a loss of confidence.  *Id.* ¶ 121.  The termination paperwork summarized the reasons for termination:

> Since the Written Warning was delivered, Quala has shown no intention of showing immediate and sustained improvement on the issues raised in the warning.

Specifically, Quala has failed to show initiative in collaborating with other team members and stakeholders, and has continued to effectively transfer her work to others, including her manager. Among other examples, Quala: (1) did not loop in the appropriate parties on a specific request; (2) pushed work to a colleague newly covering her area, rather than introduce and/or walk him through it herself; and (3) claimed that she could not complete an impact analysis (which had originally been assigned in July) because of data discrepancies; this resulted in last-minute scramble in which her manager had to complete the work in a short timeframe – which she did in approximately one day.

*Id.*

On October 30, 2019, Plaintiff met with Chief Compliance Officer Cathy Duffy and an HR representative, and was notified that her employment was being terminated. *Id.* ¶ 123. Plaintiff's employment terminated effective November 15, 2019. *Id.*

**Q.** **Shortly After The Termination of Her Employment at JPMorgan, Plaintiff Started a High-Paying Job at Wells Fargo.**

As noted, Plaintiff had been looking for other roles both inside and outside JPMorgan since January 2019. *Id.* ¶ 44. Following the termination of her employment at JPMorgan effective November 15, 2019, Plaintiff commenced a compliance role at Wells Fargo in January 2020 that paid her more than she was making at JPMorgan, and she remains employed by Wells Fargo today. *Id.* ¶¶ 128-130.[1]

**R.** **OHSA Investigated And Dismissed Plaintiff's SOX Retaliation Claim.**

In Spring 2020, Plaintiff filed with the Occupational Safety and Health Administration ("OSHA") a SOX retaliation complaint that alleged that her termination of employment was

---

[1] At the time of the termination of her employment, Plaintiff was seeking employment with the New York Attorney General's ("NY AG") office. *Id.* ¶ 124. Plaintiff alleges that she received a conditional offer from the NY AG's office, but the offer was withdrawn with the NY AG's office was unable to obtain an employment reference for Plaintiff from JPMorgan. As discussed below, there is no evidence that anyone at JPMorgan did anything, or refused to do anything, that impeded Plaintiff's application to the NY AG's office, much less that such action or omission was in retaliation for protected activity.

retaliation for SOX-protected activity.  *Id.* ¶ 131.  On April 30, 2021, OSHA issued the Secretary's Findings, ruling that "Respondent [JPMorgan] has shown by clear and convincing evidence, absent Complainant's alleged protected activities, they would have taken the same adverse action.  There is no reasonable cause to believe Respondent violated SOX."  *Id.* ¶¶ 132-133.  Plaintiff commenced this action on November 11, 2021, seeking to litigate *de novo* her SOX retaliation claim.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The nonmoving party may escape summary judgment only by demonstrating the existence of a genuine issue of material fact requiring trial.  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  The nonmoving party must do more than proffer "[b]ald assertions or conjecture unsupported by evidence."  *Balut v. Loral Elec. Sys.*, 988 F.Supp. 339, 343 (S.D.N.Y. 1997).

## ARGUMENT

To establish a *prima facie* case of retaliation under SOX, an employee must "prove by a preponderance of the evidence that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action."  *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013).  "If the employee establishe[s] these four elements, the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior.'"  *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 589 (S.D.N.Y. 2019).

Summary judgment should be granted to JPMorgan on Plaintiff's SOX claim because:  any alleged adverse action prior to the termination of employment was not timely exhausted before OSHA, and Plaintiff's allegations of post-termination retaliation likewise were not exhausted

before OSHA, and otherwise fail as a matter of law; and any alleged protected conduct was not a contributing factor to the termination of her employment and, in any event, JPMorgan has clearly and convincingly demonstrated that it would have terminated Plaintiff's employment in the absence of any such conduct.

## I.    The Alleged Adverse Actions Occurring Before And After The Termination Of Plaintiff's Employment Were Not Timely Exhausted Before OSHA.

SOX requires the filing of an administrative claim within 180 days of the violation.  18 U.S.C. § 1514A(b)(2)(D).  Plaintiff's OSHA complaint is dated April 27, 2020.  SUMF ¶ 131.  It, therefore, is timely only for actions that occurred on or after October 30, 2019, which is the date on which Plaintiff was notified of the termination of her employment.  Compl. ¶ 101.

Plaintiff's failure to timely file an administrative complaint with regard to any alleged adverse actions prior to the termination of her employment deprives the Court of jurisdiction to consider them as violations of SOX.  *Daly v. Citigroup Inc.*, 939 F.3d 415, 428 (2d Cir. 2019) ("We therefore conclude that the administrative exhaustion requirements under SOX are jurisdictional and a prerequisite to suit in federal court.").  The Court should grant summary judgment to JPMorgan for any alleged adverse action that occurred prior to October 30, 2019, which would include Plaintiff's 2018 performance review, any compensation decisions made for 2019, and the Written Warning delivered on October 24, 2019.

In addition, Plaintiff never filed a complaint with OSHA alleging post-employment retaliation, particularly relating to her application for employment with the NY AG's office. Plaintiff filed her OSHA complaint on April 27, 2020, several months after learning she did not receive the role with the NY AG's office, and yet her complaint makes no reference to any alleged post-employment adverse employment actions.  SUMF ¶ 131.  As such, this Court is without jurisdiction to consider such claims.  *Daly*, 939 F.3d at 428.

## II.   Plaintiff's Alleged Protected Conduct Was Not A Contributing Factor To Any Alleged Adverse Action.

To advance a *prima facie* retaliation claim under SOX, Plaintiff must show that her alleged protected activity was a contributing factor to the adverse action. 29 C.F.R. § 1980.104(e)(1)-(2).[2] There is no genuine dispute of material fact sufficient to allow a reasonable jury to find that any alleged protected activity was a contributing factor to any alleged adverse action, including the termination of Plaintiff's employment.   Plaintiff's employment was terminated only following performance deficiencies and behaviors that were documented throughout her employment, and identified by a wide range of individuals, including multiple managers, co-workers, and subordinates:

- Plaintiff received a "Growth" rating (the lowest of three possible ratings) for Teamwork and Leadership in her 2018 performance review, along with the feedback from her manager that "[w]here Quala could seek to improve is in her collaboration and communication." SUMF ¶¶ 37-42.

- Economou complained to Laferriere in May 2019 that it "seems like [Williams] doesnt [sic] want anyone on the team talking to her" so he would like to keep his communications with her "on [an] email basis going forward if thats [sic] OK." *Id.* ¶ 58.

- Norris reported to Laferriere that Plaintiff repeatedly acted rude toward colleagues and had "trouble communicating with a lot of team members," which "made working on TPI related projects very uncomfortable." *Id.* ¶ 68.

- Banerjee's 360° review stated that "interacting with [Plaintiff] was difficult" and that she "does not always receive constructive feedback in a positive manner." *Id.* ¶ __.

- Singh complained to Laferriere and Human Resources that his interactions with Plaintiff left him "feeling humiliated," was "causing him emotional and physical distress," "was

---

[2]  Plaintiff raised numerous complaints on a variety of issues from the outset of, and continuing throughout, her employment.  Many of the issues she raised did not relate to one of the laws enumerated by SOX, and even those that did arguably relate to such laws, she did not and could not have any reasonable belief as to a violation of such laws.  For purposes of this motion, however, JPMorgan does not contend that there is no genuine issue of material fact as to whether Plaintiff engaged in *any* SOX protected activity at all.  Rather, JPMorgan contends that no reasonable jury could find that any complaint relating to one of the laws enumerated by SOX was a contributing factor to any alleged adverse action.

verbally abusive to him" which "was taking a psychological toll on him outside of work," and that these were not isolated incidents, but that he had "been facing similar issues with [Plaintiff] since my first month of joining the team." *Id.* ¶¶ 60, 66, 67, 76.

- Mailys Abos, Assistant General Counsel, confirmed to Ross: "She [Plaintiff] has an attitude! I feel for you, can't be easy to work with her." *Id.* ¶ 57.

- Plaintiff gave apathetic responses to her managers, stating that she did not care about work allocation issues, and she did not wish to lead certain projects, which is consistent with the fact that Plaintiff was actively trying to leave her role since January 2019. *Id.* ¶ 65, n.3.

- Punke reported to Laferriere on October 2, 2019, that interactions between Plaintiff and Ouli were "getting out of hand[.]" *Id.* ¶ 95.

- 360° feedback from Punke, Ouli, and Banerjee reflected that Plaintiff's unprofessional interactions with team members were impeding the work of the TPI group. *Id.* ¶¶95-102.

Plaintiff was delivered a Written Warning about her performance and behavioral deficiencies, and admits that she did nothing to improve her performance or behaviors following delivery of the Written Warning, and had no intention of doing so. *Id.* ¶ 113. Not surprisingly, Laferriere noticed that Plaintiff appeared to have no intention to improve on the issues identified in the warning, and continued to do the same things that were just addressed in the warning. *Id.* ¶¶ 114-117. As a result, the decision was made to terminate Plaintiff's employment for a loss of confidence. *Id.* ¶ 121.

### A.   Rather Than Retaliate, JPMorgan Devoted An Extraordinary Amount of Resources to Considering and Investigating Plaintiff's Complaints or Concerns.

Far from retaliating against Plaintiff, JPMorgan provided Plaintiff with regular meetings and communications with management several levels above her, provided her with regular meetings with two levels of management to put forward and issues, concerns or proposals relating to the TPI program or anti-corruption in general (called "Opportunities and Enhancements" meetings), and appointed two sets of investigators to investigate her more formal complaints. *Id.* ¶¶ 25-26. Plaintiff, however, never was satisfied. Within three months, she had met repeatedly

with three levels of management.  When her managers provided advice or suggestions, however, such as when Bridgeford provided a suggestion on Plaintiff's 2018 self-evaluation, or Laferriere provided a suggestions for Plaintiff's 2019 goals, Plaintiff construed that as an effort to prohibit her from doing something a different way.  *Id.* ¶¶ 27-29.  When she complained about her performance review, her concerns were considered and certain adjustments made.  *Id.* ¶ 49.  When Plaintiff complained about her first manager, Ross, her allegations were investigated and he was coached on his communications with Plaintiff.  *Id.* ¶ 70.  When Plaintiff complained about her second manager, Laferriere, her allegations were investigated and found without merit.  *Id.* ¶ 91.

Because Plaintiff worked in anti-corruption compliance, and one of her responsibilities was specifically to propose changes or enhancements to the TPI program, some of her complaints involved compliance issues that had legal implications.  Plaintiff's managers openly encouraged her to raise issues, and commended her for doing so.  Bridgeford created the Opportunities and Enhancement meetings specifically for Plaintiff to present any potential issues with the TPI program that Plaintiff so desired.  *Id.* ¶ 25.  In her 2018 annual review, Ross commended Plaintiff for being "thoughtful and proactive in identifying areas of enhancement [for TPI-related controls]."  *Id.* ¶ 40.  In June 2019, Laferriere also instructed Plaintiff to "continue to be the GACC lead on the TPI enhancements project" because "[a]gain, you have a good eye for spotting potential issues, and I want to utilize your skill set as long as you choose to stay with us."  *Id.* ¶ 89.

In some cases, Plaintiff was provided feedback as to how she could be more effective in raising issues:  think the issues through before escalating, ensure that all of the appropriate stakeholders and subject matter experts are included, and propose solutions to the issues she wanted to raise.  *Id.* ¶¶ 32-34.  There is nothing inappropriate about this feedback.  To the contrary,

adopting this feedback would have improved Plaintiff's performance by making her more effective in proposing changes to JPMorgan's compliance programs.

Nor did raising any concerns give Plaintiff license to be rude and unprofessional, to push work onto others, or to fail to complete projects assigned to her. These performance deficiencies were lawfully addressed with Plaintiff and, when she did not improve, her employment was terminated. There is no genuine dispute of material fact that would permit a finding that any alleged protected activity was a contributing factor to the termination of Plaintiff's employment (or any other alleged adverse action). *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir., 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Jenkins v. New York State Banking Dept.*, 2010 WL 2382417, at *11 (S.D.N.Y., 2010) ("When disciplinary action begins prior to the protected activity, there is no inference of retaliation simply because the adverse action is completed after the protected activity."); *Luxenberg v. Guardian Life Ins. Co.*, 2004 WL 385116, at *7 (S.D.N.Y., 2004) (granting employer's motion for summary judgment on retaliation claim where employee had demonstrated poor performance months before he engaged in protected activity).

## III.   JPMorgan Has Demonstrated By Clear And Convincing Evidence That It Would Have Terminated Plaintiff's Employment Regardless Of Any Protected Activity.

Assuming for purposes of this brief that Plaintiff engaged in protected activity, the overwhelming evidence of Plaintiff's behavior and performance demonstrates, clearly and convincingly, that JPMorgan would have taken the same adverse employment actions in the absence of any alleged protected activity. 18 U.S.C. § 1514A (b)(2)(c). *Both* of Plaintiff's direct managers observed and documented her improper communications and behavior; *both* of her annual reviews assigned Plaintiff below-expectations marks in those areas; and her 360° feedback

in *both* 2018 and 2019 contained complaints about Plaintiff by other managers and co-workers. *Id.* ¶¶ 39, 106, 109, 31-35, 99-102.  Plaintiff's behavior was having a significant negative impact to the team, with a more junior co-worker in the TPI group, Puneet Singh complaining about Plaintiff to HR, and alleging that she was causing him emotional distress.  *Id.* ¶¶ 72-73.

Most significantly, when Plaintiff was delivered a Written Warning requiring immediate and sustained improvement, Plaintiff, by her own admission, refused to accept any of the feedback, did nothing to improve her performance or behaviors, and had no intention of doing so.  *Id.* ¶ 113.  Given this, it was entirely lawful for her managers to lose confidence in her ability or desire to improve, and to decide it was time to terminate her employment.  *Pardy v. Gray*, 2008 WL 2756331, at *7 (S.D.N.Y. 2008) (granting summary judgment on SOX claim where the employer "received complaints of Plaintiff's poor performance from Plaintiff's co-workers and relied on those complaints in terminating her"); *In the Matter of Galinsky v. Bank of America, Corp.*, 2012 WL 5818127, *9 (ARB Oct. 31, 2012) (ruling that employer had demonstrated it would have taken the same action where "poor communication skills, rude behavior, and poor judgment … serves as clear and convincing evidence to support his termination"); *Giurovici v. Equinix, Inc.*, 2008 WL 7835842, *8 (ARB Sept. 30, 2008) (employer demonstrated by clear and convincing evidence that it would have fired employee "because of his deteriorating performance, demonstrated insubordination, and refusal to participate in teamwork"); *In the Matter of Hendrix v. American Airlines, Inc.*, 2004 WL 5345479, *18 (ALJ Dec. 9, 2004) (ruling that the "history of conflict and poor interpersonal relations" provided clear and convincing evidence that his employer would have terminated employee regardless of protected activity).

**IV.    The Court Should Grant Summary Judgment To JPMorgan On Plaintiff's Allegation of Post-Employment Retaliation.**

Plaintiff alleges that, shortly after the termination of her employment at JPMorgan, she received a conditional offer from the NY AG's office, which was withdrawn when the AG's office was unable to obtain an employment reference from JPMorgan.  Complaint ¶ 104.  As noted above, the Court lacks jurisdiction to hear this claim based on Plaintiff's failure to exhaust the claim with a timely complaint before OSHA.

Moreover, summary judgment should be granted to JPMorgan with respect to this claim because SOX does not cover post-employment actions.  *See Potts v. Center for Excellence in Higher Education, Inc.*, 908 F.3d 610, 612 (10th Cir. 2018) (construing similar anti-retaliation provision under the False Claims Act as limited to employees, and not extending to post employment actions).

In any event, no evidence exists that JPMorgan did anything improper with respect to Plaintiff's application to the NY AG's office, much less that it did so in retaliation for protected activity.  Initially, according to Plaintiff, the NY AG was not simply looking for a verification of her employment at JPMorgan, which can be obtained with a simple, automated process.  SUMF ¶¶ 124-127.  Rather, Plaintiff contends that she told the NY AG that she was fired in retaliation for whistleblowing, and they wanted to speak with someone to get JPMorgan's side of events. Plaintiff never referred the NY AG's office to any of her former supervisors and instead provided a general human resources phone number and email address.  *Id*.  She thereafter was advised that the NY AG was not proceeding with the offer of employment.  *Id*.  There is no evidence that the NY AG spoke with anyone at JPMorgan, that anyone at JPMorgan refused to provide anything requested by the NY AG's office, or that any action or inaction by JPMorgan relating to Plaintiff's application was in retaliation for protected activity.  As such, the Court should grant summary

judgment to JPMorgan on Plaintiff's claim of retaliation relating to her failure to obtain employment at the NY AG's office.

## CONCLUSION

For the foregoing reasons, JPMorgan respectfully requests that the Court grant its Motion for Summary Judgment and dismiss the Complaint in its entirety.

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

Dated:  April 29, 2022

<u>s/ *Thomas A. Linthorst*</u>
Thomas A. Linthorst
Tyler J. Hill
Carlyle Edwards-Balfour
502 Carnegie Center
Princeton, New Jersey 08540-7814
Telephone: (609) 919-6642
Fax: (609) 919-6701
Thomas.Linthorst@morganlewis.com
Tyler.J.Hill@morganlewis.com
carlyle.edwards-balfour@morganlewis.com

*Attorneys for Defendant,*
*JPMorgan Chase Bank, N.A.*