UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


SHAQUALA WILLIAMS,

                       Plaintiff,                              ECF Case 1:21-cv-09326-JSR

       - against -

JPMORGAN CHASE BANK, N.A.,

                       Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF JPMORGAN CHASE BANK, N.A.


                                 VLADECK, RASKIN & CLARK, P.C.
                                 Attorneys for Plaintiff
                                 565 Fifth Avenue, 9th Floor
                                 New York, NY 10017
                                 (212) 403-7300

Of Counsel:

     Jeremiah Iadevaia
     Kathleen C. Riley
     Brandon R. White

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

FACTS ...................................................................................................................................... 1

    A.   Plaintiff's Complaints About Compliance Problems ............................................. 1

    B.   Plaintiff Raises Her Concerns to Bridgeford and Ross ......................................... 2

    C.   Plaintiff Escalates Complaints to Boyle-Devine, the Head of Code of Conduct, and HR .... 3

    D.   Defendant Removes Duties from Plaintiff and Issues Her a Retaliatory Evaluation ........... 4

    E.   Plaintiff's Complaints to Employee Relations ..................................................... 4

    F.   The Bank's First Investigation .............................................................................. 5

    G.   JPMorgan's Cover-Up Culture Continues ............................................................ 5

    H.   The Bank's Second Investigation .......................................................................... 5

    I.   Defendant Issues Plaintiff a Retaliatory Written Warning and Fires Plaintiff ..................... 6

    J.   Defendant Retaliates Against Plaintiff Post-Employment .................................... 9

ARGUMENT ........................................................................................................................... 9

   I.     SUMMARY JUDGMENT LEGAL STANDARDS ............................................ 9

   II.    STANDARDS UNDER SOX ............................................................................... 10

   III.  THE BANK FIRED PLAINTIFF IN VIOLATION OF SOX .............................. 11

   IV.  THE BANK'S POST-EMPLOYMENT RETALIATION AGAINST PLAINTIFF ............. 23

CONCLUSION ........................................................................................................................ 25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abdur-Rahman v. DeKalb Cnty,
   2011 WL 729637 (ARB Feb. 16, 2011) ...............................................................17

Ashmore v. CGI Grp. Inc.,
   138 F. Supp. 3d 329 (S.D.N.Y. 2015).....................................................10, 11, 18

Balko v. Ukrainian Nat. Fed. Credit Union,
   2014 WL 1377580 (S.D.N.Y. Mar. 28, 2014) .......................................................11

Barker v. UBS AG,
   888 F. Supp. 2d 291 (D. Conn. 2012)....................................................12, 14, 16, 18

Bechtel v. Admin. Review Bd.,
   710 F.3d 443 (2d Cir. 2013)..................................................................................16

Braunstein v. Barber,
   2009 WL 849589 (S.D.N.Y. Mar. 30, 2009) .......................................................21

Chertkova v. Conn. Gen. Life Ins. Co.,
   92 F.3d 81 (2d Cir. 1996).......................................................................................22

Ciavarra v. BMC Software, Inc.,
   2008 WL 352273 (S.D. Tex. Feb. 7, 2008) .........................................................14

Collins v. Parexel Int'l,
   2008 WL 2405029 (E.D. Pa. June 13, 2008) .......................................................13

In re Dana Corp.,
   574 F.3d 129 (2d Cir. 2009)..................................................................................10

DeMott v. CSX Transportation, Inc.- Baltimore Div.,
   701 F. App'x 262 (4th Cir. 2017) ....................................................................14, 17

DeRosa v. Nat'l Envelope Corp.,
   595 F.3d 99 (2d Cir. 2010).....................................................................................10

Dodd v. City Univ. of New York,
   489 F. Supp. 3d 219 (S.D.N.Y. 2020)....................................................................12

Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.,
   2012 WL 3288234 (E.D.N.Y. Aug. 10, 2012).......................................................20

Edwards v. Murphy-Brown, LLC,
    760 F. Supp. 2d 607 (E.D. Va. 2011) ...................................................................24

EEOC v. David Lerner Assocs., Inc.,
    2005 WL 2850080 (D. Conn. Oct. 27, 2005) ........................................................24

Feldman-Boland v. Stanley,
    2016 WL 3826285 (S.D.N.Y. July 13, 2016) ...................................................23, 24

United States ex rel. Felten v. William Beaumont Hospital,
    993 F.3d 428 (6th Cir. 2021) .................................................................................25

Galinsky v. Bank of Am., Corp.,
    2012 WL 5818127 (ARB Oct. 31, 2012) ..............................................................17

Giurovici v. Equinix, Inc.,
    2008 WL 7835842 (ARB Sept. 30, 2008) ............................................................18

Govori v. Goat Fifty, L.L.C.,
    519 F. App'x 732 (2d Cir. 2013) ..........................................................................15

Heinemann v. Howe & Rusling,
    529 F. Supp. 2d 396 (W.D.N.Y. 2008) .................................................................20

Hendrix v. Am. Airlines, Inc.,
    2004 WL 5345479 (ALJ Dec. 9, 2004) ...............................................................18

Herrera v. Trabajamos Cmty. Head Start, Inc.,
    236 F. Supp. 3d 858 (S.D.N.Y. 2017)........................................................12, 16, 20

Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.,
    2019 WL 1649983 (S.D.N.Y. Mar. 28, 2019) ......................................................15

Jenkins v. N.Y.S. Banking Dep't,
    2010 WL 2382417 (S.D.N.Y. June 14, 2010) ......................................................16

Jones v. Southpeak Interactive Corp. of Del.,
    777 F.3d 658 (4th Cir. 2015) .................................................................................24

Jute v. Hamilton Sundstrand Corp.,
    420 F.3d 166 (2d Cir. 2005).................................................................................12

Kao v. Areva, Inc.,
    2018 WL 2927677 (ARB Apr. 30, 2018) .......................................................17, 22

Kaytor v. Elec. Boat Corp.,
    609 F.3d 537 (2d Cir. 2010)................................................................................10

Kshetrapal v. Dish Network, LLC,
    90 F. Supp. 3d 108 (S.D.N.Y. 2015)...............................................................24, 25

Leshinsky v. Televent GIT, S.A.,
    942 F. Supp. 2d 432 (S.D.N.Y. 203).................................................11, 12, 16, 18

Levi v. Anheuser Busch Inbev,
    2014 WL 4050091 (ARB July 24, 2014)..................................................................25

Lozada-Leoni v. MoneyGram Int'l, Inc.,
    2020 WL 7000874 (E.D. Tex. Oct. 19, 2020) ........................................................10

Luxenberg v. Guardian Life Ins. Co.,
    2004 WL 385116 (S.D.N.Y. Mar. 2, 2004) ............................................................16

Mahony v. KeySpan Corp.,
    2007 WL 805813 (E.D.N.Y. Mar. 12, 2007)...........................................10, 11, 13, 15

Mandell v. Cnty. of Suffolk,
    316 F.3d 368 (2d Cir. 2003)....................................................................................21

Mody v. Gen. Elec. Co.,
    2006 WL 413439 (D. Conn. Feb. 21, 2006) ...........................................................14

Monohon v. BNSF Ry. Co.,
    2016 WL 7426581 (S.D. Iowa May 11, 2016) .......................................................17

Moody v. Pepsi-Cola Metro. Bottling Co.,
    915 F.2d 201 (6th Cir. 1990) ..................................................................................23

Moran v. Premier Educ. Grp., LP,
    599 F. Supp. 2d 263 (D. Conn. 2009) .....................................................................21

Nichik v. N.Y.C. Transit Auth.,
    2013 WL 142372 (E.D.N.Y. Jan. 11, 2013) ..............................................13, 15, 19

Paley v. KLS Pro. Advisors Grp., LLC,
    2021 WL 2413373 (S.D.N.Y. June 11, 2021) (SOX)..............................................10

Pardy v. Gray,
    2008 WL 2756331 (S.D.N.Y. July 15, 2008) ...................................................13, 14

Perez v. Progenics Pharms., Inc.,
    965 F. Supp. 2d 353 (S.D.N.Y. 2013)......................................................11, 16, 17

Redd v. New York Div. of Parole,
    678 F.3d 166 (2d Cir. 2012)....................................................................................10

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)..........................................................................................10

Robinson v. Shell Oil Co.,
    519 U.S. 337 (1997)..........................................................................................25

Schneider v. Regency Heights of Windham, LLC,
    2016 WL 7256675 (D. Conn. Dec. 15, 2016)..........................................23

Sequeira v. KB Home,
    716 F. Supp. 2d 539 (S.D. Tex. 2009) .................................................19, 21, 22

Shearrer v. Norfolk S. Ry. Co.,
    2021 WL 871356 (N.D. Ala. Mar. 9, 2021) ..........................................24

Sklaver v. Casso-Solar Corp.,
    2004 WL 1381264 (S.D.N.Y. May 15, 2004) ........................................22

Slattery v. Swiss Reinsurance Am. Corp.,
    248 F.3d 87 (2d Cir. 2001) (June 6, 2001).............................................16

Smith v. Duke Energy Carolinas, LLC,
    2012 WL 2673231 (ARB June 20, 2012) ..............................................17

Sumner v. U.S. Postal Serv.,
    899 F.2d 203 (2d Cir. 1990)..................................................................15

Taylor v. Union Pac. R.R. Co., Inc.,
    2021 WL 952410 (M.D. La. Mar. 12, 2021) ...............................12, 17, 21

Terry v. Ashcroft,
    336 F.3d 128 (2d Cir. 2003)..................................................................23

Trusz v. UBS Realty,
    2016 WL 1559563 (D. Conn. Apr. 18, 2016) ........................................12

Van Elswyk v. RBS Sec., Inc.,
    2017 WL 3431395 (D. Conn. Aug. 9, 2017) .........................................15

Walsh v. New York City Hous. Auth.,
    828 F.3d 70 (2d Cir. 2016)....................................................................10

Weiss v. JPMorgan Chase & Co.,
    332 F. App'x 659 (2d Cir. 2009) ..........................................................21

Williams v. New York City Hous. Auth.,
    458 F.3d 67 (2d Cir. 2006)....................................................................24

Yang v. Navigators Grp., Inc.,
    674 F. App'x 13 (2d Cir. 2016) ..................................................................11, 14

Ziparo v. CSX Transportation, Inc.,
    15 F.4th 153 (2d Cir. 2021) ............................................................................11

**Statutes**

False Claims Act ..................................................................................................25

Federal Railroad Safety Act ................................................................................11

Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ................................... passim

Securities and Exchange Act ..........................................................................1, 2

Shaquala Williams ("Plaintiff" or "Williams") submits this Memorandum of Law in Opposition to the Motion for Summary Judgment of JPMorgan Chase Bank, N.A. ("Defendant" or the "Bank"). Material factual disputes preclude summary judgment on the whistleblower retaliation claim under the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A.[1]

FACTS

Plaintiff, a licensed attorney, joined JPMorgan on July 30, 2018, with over a decade of financial crimes experience, primarily for financial institutions in compliance. (Pl. 56.1¶134) Williams started as Vice President ("VP") in Global Anti-Corruption Compliance ("GACC"). (Id.¶¶9,135) GACC designs and enforces Global Anti-Corruption programs to ensure that JPMorgan and related companies comply with anti-corruption laws, including the Securities and Exchange Act (the "Exchange Act") and rules and regulations the Securities and Exchange Commission (the "SEC") promulgates. (Id.¶6)

Plaintiff was responsible for managing, assessing, and improving JPMorgan's Third Party Intermediary ("TPI") program. (Id.¶12) She had duties for other GACC programs (also called workstreams), including investigations, transactions, and referred candidates. (Id.¶11) Plaintiff reported to Garrett Ross ("Ross"), VP; Ross to Tim Bridgeford ("Bridgeford"), GACC Head; Bridgeford to Jennifer Boyle-Devine ("Boyle-Devine"), Managing Director and Global Head of Employee Compliance; and Boyle-Devine to Cathy Duffy ("Duffy"), Chief Compliance Officer for Commercial Banking and Employee Compliance. (Id.¶13)

A.    Plaintiff's Complaints About Compliance Problems

Williams identified numerous deficiencies in the compliance workstreams, including TPI.

---

[1] Defendant's Memorandum of Law in Support of Its Summary Judgment Motion is cited as "Def. Br." Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts and Counterstatement of Disputed Facts is cited as "Pl. 56.1 ¶--," and has a more detailed statement of facts. Defendant's Local Rule 56.1 Statement of Material Facts is cited as "Def. 56.1 ¶--."

(<u>See, e.g.</u>, Pl. 56.1¶¶158-71, 215-25) She believed the programs failed to comply with the law, including SEC rules and regulations about books and records and internal controls.  (<u>See, e.g.</u>, <u>id.</u>¶¶27, 80-81, 113, 142-158, 164, 168, 215-25, 239, 248)  Williams was especially concerned because in 2016 the SEC and other United States government agencies found that the Bank had violated the law, including the Exchange Act, by providing jobs to the relatives and friends of executives of its clients, potential clients, and foreign government officials, with the intent to influence those officials.  (<u>Id.</u>¶¶145-48)  In a Non-Prosecution Agreement ("NPA") and SEC Cease and Desist Order ("SEC Order"), the Bank committed to adopt new controls, compliance codes, policies, and procedures to ensure fair and accurate books, records, and accounts and a rigorous anti-corruption compliance program. (<u>Id.</u>)

Plaintiff raised concerns about, <u>inter alia</u>, the Bank's lack of procedures; no invoice controls; lack of independent oversight within Compliance and Monitoring & Testing; failure to establish scope of referred candidate monitoring; concerns about inadequate risk assessments for TPIs; training and documentation problems for TPIs, corporate transactions, and travel and expense reimbursements; and misrepresentations and misleading disclosures to government agencies, including the SEC and international regulators. (<u>See, e.g.</u>, Pl. 56.1¶¶158-71, 215-25)

B.    <u>Plaintiff Raises Her Concerns to Bridgeford and Ross</u>

Between August and November 2018, Plaintiff raised concerns about the Bank's compliance failures to Ross and Bridgeford. (Pl. 56.1¶¶14, 19, 21-25, 27-29, 159-61, 165, 167, 172-74) During meetings with Bridgeford between August and October 2018, Williams complained about numerous issues, including that Ross and others were hiding problems with TPI and other programs. (<u>Id.</u>¶¶19, 21-25, 27-29, 161-62, 167, 172-74)  Ross and Bridgeford were dismissive, tried to thwart her complaints, and were hostile towards her efforts.  (<u>Id.</u>¶¶ 21-22, 25, 47, 55, 150, 155, 160-62, 166-73, 175, 187, 195) They told her addressing the problems would

be too much work and were outside of their job duties; they described her complaints as "unhelpful"; Ross yelled at Plaintiff for raising concerns about a sanctions issue; Ross called Plaintiff insubordinate; Bridgeford directed Plaintiff to "let go" concerns about a disclosure to a regulator; and Bridgeford warned Plaintiff that making Human Resources ("HR") complaints "would not be viewed favorably." (Id.¶¶21-23, 25, 47, 55, 160-62, 171, 173, 187, 195)

Bridgeford and Ross took other steps to suppress Plaintiff's complaints. Plaintiff prepared written materials for global monthly meetings with senior Compliance leaders. (Id.¶166) Ross directed Plaintiff to remove from those materials standard industry terms such as "gap," "issue," "risk," and "remediation," which Plaintiff used to describe critical compliance problems. (Id.¶¶21, 25, 55, 150, 166, 172, 175) By November 2018, Defendant relegated Plaintiff to raising compliance concerns during much smaller meetings that managers called "Opportunities and Enhancements." (Id.¶¶25, 169) Even in connection with the informal working group, Bridgeford and Ross censored Williams. (Id.¶170) Williams's managers directed her not to use the industry standard terms for meeting materials because senior management discouraged them as discoverable by regulators. (Id.¶¶55, 167-68, 170) They told her to use euphemisms such as "under review" and "opportunity." (Id.¶¶25, 155)

C.   Plaintiff Escalates Complaints to Boyle-Devine, the Head of Code of Conduct, and HR

Because Bridgeford and Ross failed to address the issues that she had identified, Williams escalated them to more senior employees in November 2018. (Pl. 56.1¶¶30, 175-77) Williams also complained to HR about the unlawful conduct in November 2018. (Id.¶27) In October 2018, Williams told Bridgeford that she had planned in her self-evaluation to describe her efforts thus far but was afraid Ross would edit her comments if she used the forbidden terms such as gap and remediation. (Id.) Bridgeford warned Plaintiff to be "accurate and precise" in her "wording" and that he did not like the word "gap." (Id.¶¶27-29) When Plaintiff told

3

Bridgeford that she had spoken to HR about her self-assessment, Bridgeford said he was upset that she had gone to HR and that she needed to work on her communication. (Id.)

D.   <u>Defendant Removes Duties from Plaintiff and Issues Her a Retaliatory Evaluation</u>

After Plaintiff escalated her complaints, the Bank retaliated.  In November and December 2018, the Bank limited Plaintiff's duties to the TPI program by removing her from other workstreams and, by late January 2019, Williams's managers were excluding her from TPI meetings. (Pl. 56.1¶¶55, 178-79, 195) Defendant issued a retaliatory evaluation. (Id.¶¶39, 180-83) Before Plaintiff spoke to senior management and HR, Ross had assigned her draft ratings of "on track" for the three categories in her 2018 annual review. (Id.¶¶38-39, 180-82) Bridgeford said that she was "too new" to review and she would receive generally positive reviews. (Id.¶24) But, on January 2, 2019, Ross gave Plaintiff her 2018 evaluation, which downgraded her rating in one of the three categories. (Id.¶¶35,39) The review contained false information about Plaintiff's work and criticisms linked to Plaintiff's complaints. (Id.¶¶35, 39, 41-42, 183)

The 2018 performance review also included positive feedback contradicting the criticisms.  Ross wrote that Plaintiff was a "helpful resource[,]" a "key partner[,]" and a "strong colleague."  (Id.¶41; <u>see</u> id.¶¶39-40) Plaintiff's colleagues described her as a "significant asset to the TPI team[,]" "detail oriented and analytical," "thoughtful[,]" "proactive[,]" and "pleasant to work with[.]"  (Id.¶¶31-32, 39-40)  Plaintiff received 100 percent of her 2018 target incentive compensation, which was based in part on her performance.  (Id.¶¶9, 31)

E.   <u>Plaintiff's Complaints to Employee Relations</u>

In early 2019, Williams complained to Employee Relations ("ER") about GACC's serious compliance deficiencies and retaliation, including her 2018 evaluation. (Pl. 56.1¶¶45-51, 55, 69, 150, 152, 158, 184-95)  In February 2019, Williams wrote, <u>inter alia</u>, that she had "escalated a number of perceived gaps and issues with the program and processes" to Bridgeford

4

and Ross and that they had been "resistant to talking about" those problems.  (Id. ¶55)  In late March 2019, an ER investigator and an attorney in the Bank's HR Law Group began their allegedly privileged investigation. (Id.¶¶52, 189-95; Def. 56.1¶56)

F.    The Bank's First Investigation

Around the time that Defendant designated the investigation privileged, the Bank made several changes in GACC. (Pl. 56.1¶¶52-53, 69-70, 196, 200) Due to Plaintiff's complaints, Defendant fired Bridgeford and removed Ross as her supervisor and assigned him elsewhere. (Id.¶¶52-53, 69-70, 196) In June 2019, the investigation concluded and found that Ross had problems communicating with Williams and directed that Boyle-Devine coach Ross. (Id.¶¶52, 69-70, 198) The investigators recommended improvements in GACC to senior management and made several changes to Williams's 2018 annual review.  (Id.¶¶51, 71)

G.    JPMorgan's Cover-Up Culture Continues

At the end of March 2019, JPMorgan appointed Melissa Laferriere ("Laferriere") as GACC Co-Head and Plaintiff reported to her.  (Pl. 56.1¶¶53, 200)  Laferriere learned about Plaintiff's complaints and the investigation. (Id.¶202)  Ross warned her to be "careful" with Williams.  (Id.¶¶53, 58-60, 75, 201)  The major problems in Compliance continued including: the EMEA team's refusal to use accurate compliance terminology for deficiencies; ongoing material misrepresentations and omissions to regulators, including disclosures pursuant to the SEC Order and NPA; and the lack of internal controls around TPI invoices.  (Id. ¶¶211-25)  This was not surprising; the Head of the EMEA team told Plaintiff that Duffy, a senior Compliance executive, would "rip off their heads" if they escalated concerns to her.  (Id.¶¶211-12)

H.    The Bank's Second Investigation

Between August and October 2019, Plaintiff raised protected complaints about the Compliance program and other unlawful practices to Laferriere, HR, ER, and the Bank's

Government Investigations and Regulatory Enforcement Group ("GIRE"). (See, e.g., Pl. 56.1¶¶80-82, 226-35, 237-41, 245-53)   In August 2019, Plaintiff told ER and HR about: Laferriere's excluding her from work in retaliation for prior complaints; the Bank's inaccurate reports to foreign regulators; and its using euphemisms for major compliance issues to avoid regulatory oversight. (Id.¶¶81, 228-32)   Plaintiff also conducted multiple meetings concerning major gaps in the TPI program that she identified in a document called an issues log. (Id.¶225) On September 6, 11, and 13, Plaintiff told Laferriere, orally and in writing, that she continued to experience unlawful treatment, including bias and retaliation because of her, inter alia, concerns about deficient compliance programs and practices that she believed unlawful. (Id.¶¶79-81, 105, 233-35, 241)

On September 11, 2019, JPMorgan opened an investigation into Plaintiff's protected complaints and assigned investigators, including Jon Batterman ("Batterman"), Executive Director and Assistant General Counsel for GIRE.   (Id.¶¶81, 105, 237-40) Batterman was responsible for investigating Plaintiff's contentions that, inter alia, the Bank lacked SEC-mandated internal controls; made false or misleading reports to regulators; and attempted to hide compliance problems. (Id.¶239)   On September 19, Plaintiff submitted a written complaint to the investigators describing the above concerns. (Id.¶¶81-82, 245)   Between mid-September and October 30, 2019, Plaintiff frequently communicated with the investigators, including in a two-hour meeting on October 7, 2019. (Id.¶¶81-82, 92, 240, 245-53) Plaintiff discussed, inter alia, her own investigation and opposition in connection with the Bank's non-compliant programs. (Id.¶¶81, 248) Plaintiff explained that the programs failed to comply with requirements, including the NPA, SEC Order, and SEC rules and regulations. (Id. ¶¶81-82, 239, 248)

I.      Defendant Issues Plaintiff a Retaliatory Written Warning and Fires Plaintiff

Defendant failed to follow its policies in taking disciplinary action against Plaintiff.

From March to August 2019, Laferriere expressed no major concerns to Plaintiff about her performance or her ability to work with others.  (Id.¶¶78, 203, 210, 264)  Plaintiff received positive feedback from her peers and others, who described her as "incredibly knowledgeable and very thorough"; was "very responsive"; was "easy and pleasant to work with"; had "excellent written and verbal communication skills"; and had a "commitment to excellence and teamwork." (Id.¶¶204-09)  On August 28, 2019, at Plaintiff's mid-year review, Laferriere did not share concerns about Plaintiff's performance. (Id.¶¶78, 210, 264)  There was no mention before September 2019 about disciplining Plaintiff.  (Id.¶256)  That changed following Plaintiff's refusal to back down from her protected complaints.  (Id.¶¶255-84)

As set forth above, Plaintiff sent emails on September 11 and 13, 2019 complaining about unlawful conduct.  (Id.¶¶80, 105, 235, 241)  On September 13, 2019, Laferriere groused to Compliance executives Duffy and Frank Pearn ("Pearn"), about Plaintiff's complaints.  (Id.¶¶80, 242-44)  On the same day, Duffy told Laferriere not to engage with Plaintiff via email and that she and Pearn would meet with HR the following week to talk about Williams.  (Id.)

In late September, within weeks of Plaintiff's September complaints and shortly after a second privileged investigation commenced, Laferriere, Boyle-Devine, and others began discussions about issuing Plaintiff a written warning.  (Id.¶¶255-56)  Boyle-Devine solicited negative feedback about Plaintiff from Laferriere and Ross.  (Id.¶258)  Laferriere drafted the Written Warning, which she sent for review on October 10, 2019.  (Id.¶¶65, 257)  The notes of Elizabeth Dorritie ("Dorritie"), an HR Executive Director, show that HR, GIRE, and ER discussed the Written Warning at the same time they were talking about Plaintiff's protected retaliation complaints and the investigation. (Id.¶259) They used disparaging language to describe Plaintiff complaints, including calling Plaintiff "emotional" about her claims and "not

7

the best person." (Id.)

On October 24, 2019, Defendant gave Plaintiff the Written Warning, which included false allegations, different standards than those applied to other employees, and criticisms related directly to Plaintiff's complaints. (Id.¶¶ 65, 96, 110-11, 261-72) Contrary to the Performance, Discipline, and Workplace Concerns Policy and the Bank's practice, Defendant failed to use corrective action before issuing the October 24, 2019 Written Warning. (Id.¶¶120, 280, 282) Defendant's managers have various tools to address employee performance, including coaching, performance improvement plans, and verbal and written warnings. (Id.¶¶280, 282) Under Defendant's policies, a written warning is appropriate "if there has not been any improvement in an employee's performance after, potentially being coached or receiving a verbal warning." (Id.¶¶120, 280) Despite Defendant's well-established policy and practice, the Bank did not alert Plaintiff to the purported problems or that her job was in jeopardy until issuing the Written Warning. (Id.¶120)

A written warning is designed "to notify an employee where they need to make [an] improvement" and, typically, to give an employee 30 days to improve performance. (Id.¶¶120, 280-81) Defendant told Plaintiff that she would have one week to submit a response to the warning. (Id.¶¶113, 263, 267) Six days after the warning, however, on October 30, 2019, Defendant fired Plaintiff. (Id.¶¶111-13, 123, 267, 273, 276-77) Defendant offered Plaintiff severance in exchange for a general release of legal claims, which Plaintiff declined. (Id.¶¶123, 275)

Contrary to JPMorgan's policy, Defendant fired Plaintiff before creating a Recommendation for Termination (the "RT"). (Id.¶¶121-22, 278) The Bank completed the document weeks later. (Id.¶117, 121-23) Also contrary to policy, Defendant fired Plaintiff while

its second investigation was ongoing; the Bank completed its investigation in March 2020. (Id.¶¶90, 284) Nelli Childs ("Childs"), a senior HR executive, testified that Plaintiff's firing was "unique." (Id.¶255, 278) Also, the alleged incidents cited in the RT purportedly occurring between the Written Warning and her dismissal did not warrant firing Plaintiff and certainly not on an expedited basis. (Id.¶¶114-17, 120)  For example, Defendant criticized Plaintiff for her alleged failure to complete a project, but it was a joint effort and her colleague suffered no consequences due to the supposed failure. (Id.¶117)  Laferriere did not give Plaintiff feedback about the supposed deficiencies until the day JPMorgan fired her. (Id.¶¶114, 283)

J.      Defendant Retaliates Against Plaintiff Post-Employment

After Defendant fired Plaintiff, she received a conditional job offer from the New York Office of the Attorney General ("OAG"). (Pl. 56.1¶ 286)  As part of the OAG's background check, on December 31, 2019, OAG's HR Director told JPMorgan that Williams had applied to OAG and that she wanted to speak to a "point of contact from JP Morgan's [HR]." (Id.¶¶124-25, 287)  The Bank had exceptions to its neutral reference policy, including for government jobs. (Id.¶¶125, 288)  In response to OAG's inquiry, however, JPMorgan failed to talk to OAG. (Id.¶¶125-26, 287)   Instead, on December 31, 2019, the Bank wrote that an employment verification could be obtained via email or fax. (Id.¶¶125-26) Because the Bank failed to confirm Plaintiff's employment, OAG withdrew its offer in early January 2020. (Id.¶127)

ARGUMENT

I.      SUMMARY JUDGMENT LEGAL STANDARDS

"Summary judgment is inappropriate when the admissible materials . . . make it arguable that the claim has merit." Redd v. New York Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks and citation omitted). This Court "may not properly consider the record in piecemeal fashion . . . rather, it must review all of the evidence," Kaytor v. Elec. Boat Corp.,

9

609 F.3d 537, 545 (2d Cir. 2010), "in the light most favorable" to the non-movant. DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 102 (2d Cir. 2010).

The Second Circuit has "long recognized 'the need for caution about granting summary judgment to an employer in a [retaliation] case where, as here, the merits turn on a dispute as to the employer's intent.'" Walsh v. New York City Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016); see Paley v. KLS Pro. Advisors Grp., LLC, 2021 WL 2413373, at *1 (S.D.N.Y. June 11, 2021) (SOX). A court may not credit the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached.[2]

## II.    STANDARDS UNDER SOX

"It is now well accepted that courts should construe Section 806 broadly."[3]  "Courts employ a burden-shifting framework to assess retaliation claims under Section 806." Ashmore v. CGI Grp. Inc., 138 F. Supp. 3d 329, 340 (S.D.N.Y. 2015) (citing Bechtel v. Admin. Review Bd., 710 F.3d 443, 447 (2d Cir. 2013)).  At summary judgment, a plaintiff need demonstrate only that a rational factfinder could determine that: (1) plaintiff engaged in protected activity, (2) defendant was aware of it, (3) plaintiff suffered unfavorable personnel action, and (4) the protected activity contributed to the unfavorable action.  Yang v. Navigators Grp., Inc., 674 F. App'x 13, 14 (2d Cir. 2016) (citing Bechtel, 710 F.3d at 447); Perez v. Progenics Pharms., Inc., 965 F. Supp. 2d 353, 362 (S.D.N.Y. 2013).[4]

---

[2] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000); see In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness).

[3] Lozada-Leoni v. MoneyGram Int'l, Inc., 2020 WL 7000874, at *18 (E.D. Tex. Oct. 19, 2020) (citing Leshinsky v. Televent GIT, S.A., 942 F. Supp. 2d 432, 440-41 (S.D.N.Y. 203)); see Mahony v. KeySpan Corp., 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007) ("The law was intentionally written to sweep broadly . . . .").

[4] See Ziparo v. CSX Transportation, Inc., 15 F.4th 153, 158 (2d Cir. 2021) (Federal Railroad Safety Act ("FRSA")))).  Courts often look to case law construing comparably phrased anti-retaliation provisions in other federal whistleblower and employment discrimination statutes,

Assuming a plaintiff establishes her <u>prima facie</u> case, the burden shifts to the employer. At this stage, "'summary judgment is appropriate only when, construing all of the facts in the employee's favor, there is no genuine dispute that the record <u>clearly and convincingly</u> demonstrates that the adverse action would have been taken in the absence of the protected behavior.'" <u>Ashmore</u>, 138 F. Supp. 3d at 340 (quoting <u>Leshinsky</u>, 942 F. Supp. 2d at 441) (emphasis added). "Thus, the defendant's burden under Section 806 is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in [SOX] retaliation cases a more difficult proposition." <u>Leshinsky</u>, 942 F. Supp. 2d at 441; <u>see</u> <u>Mahony</u>, 2007 WL 805813, at *7 ("standard is even more stringent tha[n] the already 'tough standard' that employers face in other employment . . . cases"). JPMorgan fails to satisfy its burden and summary judgment should be denied.

III.    <u>THE BANK FIRED PLAINTIFF IN VIOLATION OF SOX</u>

    A.    <u>Plaintiff Demonstrates a Prima Facie Case</u>

Defendant concedes (Def. Br. 18 n.2), as it must, that Plaintiff engaged in protected activity under SOX, that it was aware of Plaintiff's protected activity, and that Plaintiff's firing was an adverse action.[5] The Bank contends (Def. Br. 18-21), however, that Plaintiff cannot show that her protected activity contributed to her discharge. There is ample evidence to the contrary.

"The words 'a contributing factor' mean any factor which, alone or in connection with

---

including Title VII. <u>Balko v. Ukrainian Nat. Fed. Credit Union</u>, 2014 WL 1377580, at *10 (S.D.N.Y. Mar. 28, 2014), <u>R&R adopted</u>, 2014 WL 12543813 (S.D.N.Y. June 10, 2014).

[5] Defendant contends (Def. Br. 17) that other adverse actions pre-firing are untimely. Even if true, they are still relevant background evidence. <u>See, e.g.</u>, <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 176 (2d Cir. 2005) ("evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [a] timely claim'" (quoting <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002)); <u>Dodd v. City Univ. of New York</u>, 489 F. Supp. 3d 219 (S.D.N.Y. 2020) (in denying summary judgment, relying upon background evidence of several years of incidents outside the statute of limitations).

other factors, tends to affect in any way the outcome of the decision." Leshinsky, 942 F. Supp. 2d at 449.[6]  "'A plaintiff need not prove that her protected activity was the primary motivating factor in her termination, or that the employer's articulated reason was pretext in order to prevail.'"  Id. at 449-50 (quoting Barker v. UBS AG, 888 F. Supp. 2d 291, 300 (D. Conn. 2012)). "This standard imposes a 'relatively low burden' on plaintiff."  Trusz v. UBS Realty, 2016 WL 1559563, at *7 (D. Conn. Apr. 18, 2016).[7] As with other retaliation claims,

> [t]here are numerous facts that courts can consider when deciding if the protected activity was a contributing factor in the ultimate employment decision, including the amount of time between the protected activity and the adverse employment action, the existence of a strained relationship between the party and the employer, any isolation of the employee from the company, and changed performance evaluations.

Barker, 2011 WL 283993, at *4.

1.    Temporal Proximity Shows Retaliatory Intent

At the prima facie stage, temporal proximity alone suffices to show that Plaintiff's protected activity contributed to her firing.  The adverse actions closely followed Plaintiff's protected activity here.  Defendant does not argue otherwise.  (See generally Def. Br. 18-21)

A juror could find that the more Williams protested misconduct, the worse the Bank's treatment became, including negative performance evaluations, reduced responsibilities,

---

[6] Herrera v. Trabajamos Cmty. Head Start, Inc., 236 F. Supp. 3d 858, 867 (S.D.N.Y. 2017) ("lower courts agree that [contributing factor] means 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'") (quoting Perez, 965 F. Supp. 2d at 366)).

[7] See also Taylor v. Union Pac. R.R. Co., Inc., 2021 WL 952410, at *8 (M.D. La. Mar. 12, 2021) ("At this prima facie stage, [plaintiff's] burden is not overly rigorous – in fact, courts have held that his protected activity can be a contributing factor 'even if [it] played only a very small role in [the employer's] decision-making process.'") (FRSA) (quoting Frost v. BNSF Ry. Co., 914 F.3d 1189, 1197 (9th Cir. 2019)).

exclusion from meetings, the Written Warning and, ultimately, her dismissal.[8]  Within weeks of Plaintiff's protected complaints in November 2018 to senior management and HR, Defendant took away her responsibilities (November and December 2018) (id.¶178) and excluded her from meetings and other work (January 2019) (id.¶179).   Defendant also downgraded Plaintiff's annual review given to her on January 2, 2019.  (Id.¶¶35, 39, 41-42, 180-83)[9]

Likewise, Plaintiff engaged in protected activity on several occasions between August and October 2019.  (See, e.g., Pl. 56.1¶¶80-82, 226-35, 237-41, 245-53)   Before September 2019, there had been no discussions about disciplining Plaintiff, including issuing her a written warning or firing her.  (Id.¶¶78, 210, 255-56, 264)  Yet, within a few weeks of Plaintiff's August and September 2019 protected activity, Defendant drafted a negative performance review for Plaintiff (October 10, 2019), issued her the Written Warning (October 24, 2019), and fired her (October 30, 2019).  (Id.¶¶65, 96, 110-13, 123, 257, 261-73, 276-77)[10]  Thus, the temporal proximity here, a matter of weeks, raises an inference of retaliation.[11]

---

[8] See Collins v. Parexel Int'l, 2008 WL 2405029, at *3 (E.D. Pa. June 13, 2008) (defendant's conduct following plaintiff's protected activity "suggest[ed] a pattern of retaliation, including repeated isolation and exclusion from his employment responsibilities").

[9] See Mahony, 2007 WL 805813, at *6 (a reasonable juror could conclude that the temporal proximity of the protected activity and earlier "shift in attitude towards [p]laintiff indicates that [p]laintiff was the victim of retaliation"); Nichik v. N.Y.C. Transit Auth., 2013 WL 142372, at *6 (E.D.N.Y. Jan. 11, 2013) (finding causation where a month after plaintiff's protected activity plaintiff began to receive numerous write ups).

[10] Defendant's citation (Def. Br. 22) to Pardy v. Gray, 2008 WL 2756331 (S.D.N.Y. July 15, 2008), is misplaced.  The Court held that a gap of six months between plaintiff's protected activity and his firing did not demonstrate causation.  Id. at *6.

[11] See, e.g., Yang, 674 Fed. Appx. at 15 (two week gap); Ciavarra v. BMC Software, Inc., 2008 WL 352273, at *4 (S.D. Tex. Feb. 7, 2008) (two month gap); see also DeMott v. CSX Transportation, Inc.- Baltimore Div., 701 F. App'x 262, 264 (4th Cir. 2017) (within three months of the first two complaints and nine days after the final complaint, plaintiff subject to adverse action); Barker, 888 F. Supp. 2d at 301 (string of actions which began in relatively close proximity to [plaintiff]'s protected activity and culminated with her termination" can satisfy causation requirement); Mody v. Gen. Elec. Co., 2006 WL 413439, at *10 (D. Conn. Feb. 21,

2.      The Bank's Comments in Response to Plaintiff's Complaints Show Bias

The Bank's managers repeatedly reacted negatively to Plaintiff's protected complaints. Managers discouraged Williams from pursuing her complaints.   Managers understood that Duffy, the Head of Employee Compliance, would "rip off their heads" if they escalated concerns to her.  (Pl. 56.1¶211)  Bridgeford and Ross instructed Plaintiff not to pursue her complaints because it would require too much work; described her concerns as unhelpful; told her that making complaints to HR would not be viewed favorably; and directed her to "let go" of problems she identified.  (Id.¶¶21-22, 25, 47, 55, 160-62, 173, 187, 195)

When Plaintiff continued escalating her concerns despite the threats, managers became angry with her.  Ross was aggressive and sometimes abusive, including yelling at Williams and calling her insubordinate.  (Pl. 56.1¶¶21, 23, 25, 47, 55, 161, 171, 187)  Bridgeford was angry when Plaintiff spoke to HR, including about compliance concerns in her self-evaluation. (Id.¶¶22, 27-29, 173)  Bridgeford and Ross stopped Plaintiff from raising her complaints during the global meetings and, instead, relegated her to smaller, less important meetings.  (Id.¶¶21, 25, 55, 150, 155, 166-70, 175)  When Plaintiff refused to sanitize a written presentation by removing industry standard terms for major compliance shortfalls, Laferriere became hostile.  She used Plaintiff's objection to euphemisms to justify the draft evaluation and the Written Warning. (Id.¶¶96, 109-10, 265)  Laferriere began grousing about Plaintiff to senior managers almost immediately after receiving Williams's September complaints and, a juror could find, her plan was to lay the foundation for formal discipline; indeed, Duffy wrote that she and Pearn were planning to speak to HR imminently. (Id.¶¶80, 242-44) Based on their conduct, a jury could find

---

2006) ("This pattern of retaliatory conduct, combined with the temporal proximity of the last complaint to termination, gives rise to a[] [retaliatory] inference.").

that Bridgeford, Ross, Laferriere, and Duffy wanted to retaliate against Plaintiff.[12]

Defendant erroneously contends (Def. Br. 19-20) retaliatory intent is negated because the Bank's managers supposedly encouraged Plaintiff to raise concerns.  Williams, however, is entitled to all reasonable inferences including a conclusion that Defendant set up the small Opportunities and Enhancement meetings to limit the reach of Plaintiff's concerns. (Pl. 56.1¶¶166-70) Similarly, a juror could find that the managers' comments purportedly commending Plaintiff for identifying areas for enhancement did not genuinely reflect their views. On the contrary, as set forth above, managers repeatedly made statements reflecting hostility towards Plaintiff for her protected activity.[13] "The choice between plausible interpretations of [the managers' comments and actions] is a question of fact to be resolved by a jury not on a motion for summary judgment."[14]

---

[12] See Mahony, 2007 WL 805813, at *6 (evidence of a strained relationship relevant to retaliation); Nichik, 2013 WL 142372, at *5 (managers said they "w[eren't] pleased"; were "annoyed"; and if complaint "g[ot] out, [the manager] was "fucked"); Sumner v. U.S. Postal Serv., 899 F.2d 203, 210-11 (2d Cir. 1990) (decisionmaker testified that the employee had a "war-like attitude" concerning unfair assignments).

[13] Defendant also erroneously asserts that because it supposedly conducted investigations determining that Williams's allegations were unsubstantiated, there was no unlawful conduct. First, Defendant, which objecting to producing documents concerning the investigations on privilege grounds, should be prohibited from relying on them. See Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc., 2019 WL 1649983, at *18 (S.D.N.Y. Mar. 28, 2019) (declining to consider on summary judgment evidence withheld on privilege grounds during discovery).  Second, a juror could conclude that the first investigation did substantiate plaintiff's complaints given that Defendant made significant changes.  (Pl. 56.1¶¶51-53, 69-71, 196, 198, 200)  Third, a juror could find that the investigations were shams designed to give the Bank protection in case of plaintiff's lawsuit or regulatory action based on her complaints.  Indeed, Defendant fired plaintiff before it had completed the second investigation.  (Id.¶¶90, 284)

[14] Govori v. Goat Fifty, L.L.C., 519 F. App'x 732, 735 (2d Cir. 2013) (quoting Sassaman v. Gamache, 566 F.3d 307 (2d Cir. 2009)); see Van Elswyk v. RBS Sec., Inc., 2017 WL 3431395, at *14 (D. Conn. Aug. 9, 2017) (plaintiff's claim was not "'fatally flawed because the questions he raised had been discussed" by others at the company long before his complaint).

3.    JPMorgan Cannot Defeat Plaintiff's Prima Facie Case

Relying on the wrong legal standard, Defendant contends (Def. Br. 18-21) that as a matter of law Plaintiff's protected activity did not contribute to her firing because of her purported performance deficiencies.   But Williams is not required to prove that Defendant's reasons for firing her are pretext to demonstrate a prima facie case.[15]

Defendant does not argue, nor could it, that the Bank began disciplinary action before Plaintiff's complaints. The documentation of Plaintiff's alleged problems began after she started complaining about unlawful conduct. (Compare Pl. 56.1¶¶14, 19, 21-25, 27-29, 159-61, 165-67, 172-74 with Def. 56.1 ¶¶37-42) Also, Williams does not rely solely on timing to establish that her protected activity contributed to the Bank's adverse actions. (See Section III(A)(2)) Thus, Defendant's cases (Def. Br. 21) are inappropriate and do not warrant summary judgment.[16]

Also, a juror could find that Defendant's contentions about Plaintiff's purported communication and behavior problems are inextricably tied to her protected activities.   The Written Warning criticized Plaintiff for accusing three team members of trying to hide risk issues. (Pl. 56.1¶¶95, 96, 110) Plaintiff believed that the team members were trying to cover up serious compliance problems and avoid regulatory oversight. (Id.) A jury could find that most of

---

[15] See, e.g., Leshinsky, 942 F. Supp. 2d at 450; Perez, 965 F. Supp. 2d at 366; Barker, 888 F. Supp. 2d at 300; cf. Bechtel, 710 F.3d at 448-49 (plaintiff's "sole burden [i]s to prove, by a preponderance of the evidence, that his protected activity contributed to the adverse employment action"); Herrera, 236 F. Supp. 3d at 869–70 ("Whether such alternative causes can, as a matter of law, defeat inferences from temporal proximity on summary judgment is an open question").

[16] See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (June 6, 2001) (finding no retaliation "[w]here timing is the only basis for a claim . . ., and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity"); Jenkins v. N.Y.S. Banking Dep't, 2010 WL 2382417, at *11 (S.D.N.Y. June 14, 2010) (plaintiff was issued a notice of dismissal in response to insubordination pre-dating "the plaintiff's initial complaint"; plaintiff was "was placed on administrative leave prior to her first [NYSDHR] complaint); Luxenberg v. Guardian Life Ins. Co., 2004 WL 385116, at *5 (S.D.N.Y. Mar. 2, 2004) (several adverse actions pre-dated plaintiff's age complaint).

16

the peer feedback related to Plaintiff's protected activities, including supposed concerns that she was too "focus[ed] on potential changes to the [TPI] program"; she "prematurely esclat[ed]" problems; she used "imprecise language"; and she did not build "consensus" when pointing out serious gaps in the Bank's TPI program.  (Def. 56.1¶¶32-34, 42, 95-96, 108)  Since the protected activity directly led to Plaintiff's firing, Plaintiff has satisfied her prima facie case.[17]

  B.  Defendant Fails to Establish Its Affirmative Defense

  Because a jury could find that Williams has established a prima facie case, the burden shifts to the Bank to show "by clear and convincing evidence" that it would have fired Plaintiff in the absence of her protected activity. Perez, 965 F. Supp. 2d at 368 (citing Bechtel, 710 F.3d at 447).  "[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established."[18]  A defendant's "burden is high" because "it is a fact intensive determination, involving questions of intent and motivation" for taking adverse action, resolving this issue on summary decision is challenging.  Kao, 2018 WL 2927677, at *3.[19]

---

[17] See Monohon v. BNSF Ry. Co., 2016 WL 7426581, at *7 (S.D. Iowa May 11, 2016) (insubordination and protected conduct were the same); Taylor, 2021 WL 952410, at *7 (a "contributing factor" is found in situations where the employee's protected activity and the adverse action are "inextricably intertwined"); Kao v. Areva, Inc., 2018 WL 2927677, at *4 (ARB Apr. 30, 2018) (insubordination was "in essence protected activity and that, at a minimum, the two were inextricably intertwined"); Abdur-Rahman v. DeKalb Cnty, 2011 WL 729637, at *5 (ARB Feb. 16, 2011) (alleged insubordination included protected safety concerns); Smith v. Duke Energy Carolinas, LLC, 2012 WL 2673231, at *7 (ARB June 20, 2012) (protected disclosures exclusively led to disciplinary investigation).

[18] DeMott v. CSX Transportation, Inc.- Baltimore Div., 701 F. App'x 262, 264 (4th Cir. 2017) (quoting Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001)).

[19] Most of the authority that the Bank cites (Def. Br. 22) involve cases decided after an administrative hearing, and not summary judgment, where the standards are different.  See Galinsky v. Bank of Am., Corp., 2012 WL 5818127, at *1 (ARB Oct. 31, 2012) (post-hearing); Giurovici v. Equinix, Inc., 2008 WL 7835842, at *9 n.1 (ARB Sept. 30, 2008) (same); Hendrix v. Am. Airlines, Inc., 2004 WL 5345479, at *1 (ALJ Dec. 9, 2004) (same).

Defendant (Def. Br. 21) fails to meet the high burden of showing it would have fired Plaintiff absent her protected activity due to supposed performance and behavior issues.  Indeed, there is ample evidence that Defendant's justification is pretext for retaliation.

1.     Plaintiff's Good Performance

JPMorgan cites Plaintiff's 2018 performance evaluation, 2019 calibration worksheet, and 360 reviews as evidence of her "improper communications and behavior."  (Def. Br. 21) While these materials assert some supposed problems, they also describe Plaintiff's performance in positive terms, including, in plaintiff's 2018 evaluation, Ross wrote that plaintiff was a "helpful resource[,]" a "key partner[,]" and a "strong colleague" and she received 100 percent of her target bonus. (Pl. 56.1¶¶9, 31-32, 39-41, 204-09)   Even if there is some evidence of dissatisfaction with Plaintiff's performance, a juror could conclude that the alleged deficiencies were insufficient to demonstrate clearly and convincingly her dismissal was warranted.[20]

2.     Defendant Applied Different Standards to Plaintiff

There is no evidence "definitively demonstrating that employees similarly situated to Plaintiff are routinely fired for comparable performance deficiencies or that Plaintiff's conduct contravened a rule customarily leading to immediate termination."  Ashmore, 138 F. Supp. 3d at 347.  Laferierre had not fired others for performance concerns or even ever issued warnings for such purported behavior. (Pl. 56.1¶121) To the contrary, similarly situated employees were not disciplined for engaging in comparable alleged misconduct.   The Recommendation for

---

[20] See, e.g., Ashmore, 138 F. Supp. 3d at 347 (while "it was clear that Plaintiff's performance was wanting, it is not clear that these insufficiencies alone warranted Plaintiff's discharge," because, inter alia, plaintiff's review was "complimentary in certain areas");  Barker, 888 F. Supp. 2d at 301–02 (denying summary judgment despite evidence of "performance and interpersonal issues" because, inter alia, performance reviews had positive elements); Leshinsky, 942 F. Supp. 2d at 451 (denying summary judgment even though "the record [left] little doubt that legitimate frustrations with Plaintiff played a large role in his firing" because "it is not beyond genuine dispute that legitimate reasons alone motivated Plaintiff's firing").

Termination for Plaintiff stated that the Bank fired her because she failed to "complete an impact assignment." (Def. 56.1¶117) But the "impact assignment" was Plaintiff's joint project with Marie Ouli, who suffered no consequences for the supposed failure. (Pl. 56.1¶117)

There were complaints about other employees' communication and teamwork, but the Bank did not subject them to discipline and those complaints did not negatively affect their ratings.[21] Ross's interactions with Plaintiff were so troubling that HR directed Boyle-Devine to coach him. (Pl. 56.1¶¶52, 69-70, 272) Boyle-Devine had never been asked to do so for another manager. (Id.¶70) Yet Ross's 2019 evaluation said nothing about his poor communication or even acknowledged the coaching. (Id.¶272) Similarly, there were complaints about O'Rourke, another GACC VP who reported to Laferriere; O'Rourke was allegedly "outright" "disrespect[ful]" to her subordinates and created a "toxic management climate." (Id.¶268) Plaintiff also had complained about O'Rourke to Laferriere; Punke confirmed that O'Rourke had been "abrupt" and her "tone was sharp" with Plaintiff. (Id.¶270) Even though Laferriere had discussed some of these issues with O'Rourke, Laferriere assigned her a rating of "on track," not "growth area," for Teamwork and Leadership in her draft 2019 evaluation. (Id.¶¶269, 271)

3.   Defendant's False Paper Trail

Other evidence casts significant doubt on Defendant's justification for firing Plaintiff. Defendant relies heavily on Laferriere's notes and emails between June and September. But a reasonable juror could find that due to Plaintiff's protected complaints, Laferriere decided to create a false paper trail suggesting Williams had behavior problems. After Ross and Boyle-

---

[21] See, e.g., Nichik, 2013 WL 142372, at *6–7 (evidence that other managerial employees would not have been disciplined for conduct similar to plaintiff's conduct); Sequeira v. KB Home, 716 F. Supp. 2d 539, 556 (S.D. Tex. 2009) (plaintiff's poor performance assessments, including his communications and failure to follow chain of command, were insufficient, standing alone, to demonstrate plaintiff was clearly and convincingly plaintiff discharged for reasons besides his SOX protected activity).

Devine warned Laferriere about Plaintiff, she started documenting supposed issues about Plaintiff and frequently met with HR to discuss Williams. (See Pl. 56.1¶¶58-62, 66-68, 108) Laferriere wrote to HR that she does not "normally write to [Lee, HR Business Partner] regarding [her] interactions with [her] directs," but then sent a two-page single-spaced email complaining about Plaintiff. (Id.¶¶61-62) There are no examples of documenting any other employees even though there were complaints about them, including O'Rourke and Puneet Singh. (See id.¶¶60, 65-67, 72, 269-71)[22]

Also, a juror could find that the evidence purportedly reflecting plaintiff's poor performance is false or so exaggerated that bias is the only explanation. Contrary to Defendant's assertion, Plaintiff responded to Ross's emails; was not resistant to helping; did not attempt to avoid meetings; did not refuse to work on an enhancement project; and did not mistreat Singh. (See, e.g., Pl. 56.1¶¶15, 17-18, 41, 61, 63, 65-68, 72-76) A jury could find that other accusations against her did not warrant documentation because, even if true, they reflected nothing more than ordinary work issues that come up for everyone. Defendant cites as examples of Plaintiff's deficiencies: two reports to Laferriere that Plaintiff supposedly said she was too busy to talk to employees at the exact moment they wanted; Ross's criticism of Plaintiff for missing a single meeting; confusion about who "owned" a meeting; and Plaintiff's mistaken belief that she was unable to forward a document. (Def. 56.1 ¶¶16, 58, 94, 97) While some of the feedback was negative, the Bank's reliance on those subjective attacks about Williams's collaboration and

---

[22] See Herrera, 236 F. Supp. 3d at 869–70 (denying summary judgment, despite evidence of misconduct, where defendant commenced investigation to search for "legitimate reasons to fire [plaintiff]" after protected complaints); Heinemann v. Howe & Rusling, 529 F. Supp. 2d 396, 413 (W.D.N.Y. 2008) ("evidence that defendants . . . began laying down a paper trail" six months before plaintiff's firing evidences retaliation); Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp., 2012 WL 3288234, at *8 (E.D.N.Y. Aug. 10, 2012) (collecting cases).

communication may also evidence pretext. (Def. 56.1 ¶¶33, 35, 41-42, 59, 62, 98-101, 109)[23]

        4.     JPMorgan's Failure to Follow Its Policies and Procedures Shows Pretext

There is evidence that at every step of the disciplinary process Defendant failed to follow its policies.  Senior HR employee Childs testified that the circumstances of Plaintiff's firing were "unique." (Pl. 56.1¶278) Those procedural irregularities show pretext.[24]

First, contrary to the Bank's policy and practice, Defendant failed to use corrective action before issuing the Written Warning; did not alert Plaintiff to the purported problems or that her job was in jeopardy until issuing the Written Warning; and did not share the file Laferriere created concerning her alleged deficiencies. (Pl. 56.1¶¶120, 280-82)[25] Evidence contradicts Defendant's contention that Laferriere gave regular feedback to Plaintiff. Plaintiff denies that she received such comments during her August 28, 2019 midyear check-in. (Id.¶¶78, 210, 264) Even though Laferriere wrote several emails to herself purportedly documenting interactions about Williams (id.¶¶58-60, 66-68), there are no contemporaneous notes concerning the August 28 meeting. (Id.¶¶78, 210) While Laferriere emailed herself several weeks later, a jury could disbelieve the email's accuracy, because Plaintiff had made allegations about Laferriere's

---

[23] See Mandell v. Cnty. of Suffolk, 316 F.3d 368, 381 (2d Cir. 2003); Taylor, 2021 WL 952410, at *9 ("adjectives [were] inherently subjective" and a finding of "insubordinate, quarrelsome, and discourteous conduct" would likely require credibility determinations that are, of course, prohibited at . . . summary judgment"); Sequeira, 716 F. Supp. 2d at 556 ("not obvious that plaintiff's behavior, [including, plaintiff's communication style and failure to adhere to the chain of command], standing alone, warranted Plaintiff's termination").

[24] See Weiss v. JPMorgan Chase & Co., 332 F. App'x 659, 664 (2d Cir. 2009) ("[w]here an employer's 'deviat[ion] from its normal decision making procedures' resulted in the challenged employment decision, an inference of pretext may arise") (quoting Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313–14 (2d Cir.1997)).

[25] See Moran v. Premier Educ. Grp., LP, 599 F. Supp. 2d 263, 278 (D. Conn. 2009) ("[T]he lack of any warning or progressive discipline . . . could lead a reasonable jury to find pretext.); Braunstein v. Barber, 2009 WL 849589, at * 8, *11 (S.D.N.Y. Mar. 30, 2009) (pretext when supervisor could not recall whether he notified of possible termination after two negative customer comments as was supervisor's usual practice).

retaliation and the second investigation was underway. (Id.¶¶233-40)

Second, the Bank failed to follow its procedures in implementing the Written Warning. The warning is designed to give an employee a chance to improve, and, typically, he or she has 30 days to do so. (Id. ¶¶120, 280-81)  Boyle-Devine testified the Bank issued Plaintiff the Written Warning "to provide [an] opportunity to formally take . . . on board the feedback." (Id.¶111)  But the Bank fired Plaintiff six days later, even before the deadline it gave her to contest the warning. (Id.¶¶111-13, 123, 267, 273, 276-77)[26] A juror could find that that the Written Warning was a sham intended to create a retaliatory firing.[27]

Third, the termination recommendation should be completed before an employee's dismissal. (Pl. 56.1¶¶121-22, 278)  Yet Defendant did not complete Plaintiff's Recommendation for Termination until weeks later. (Id.¶¶117, 121-23)  Also, contrary to practice, Defendant fired Plaintiff while the second investigation was ongoing. (Id.¶¶90, 284) A jury could infer pretext based on Defendant's repeated deviations from its procedures.[28]

### 5.   JPMorgan Considered Plaintiff's Complaints When Issuing the Warning

HR handwritten notes show that Defendant discussed Plaintiff's protected complaints at the same time it considered issuing Plaintiff the Written Warning.   The notes, which HR employee Dorritie created, state that on October 16, 2019, she met with the investigators and a

---

[26] Defendant cites Section 8.4 of its Performance, Discipline and Workplace Concerns Policy to show that an expedited firing was permitted.  However, none of the circumstances referenced therein apply here.  (Def. 56.1¶ 120; Pl. 56.1¶120)

[27] See Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 93 (2d Cir. 1996) (employer "was creating a record aimed at rationalizing plaintiff's termination"); Sequeira, 716 F. Supp. 2d at 556 (pretext where employer fired employee 10 days after issuing PIP).

[28] See Sklaver v. Casso-Solar Corp., 2004 WL 1381264, at *7-9 (S.D.N.Y. May 15, 2004) (failure to follow progressive discipline policy was evidence of pretext); Kao, 2018 WL 2927677, at *3 ("deviation from or inconsistent application of internal company policy . . . precluded [respondent], at the summary judgment stage, from clearly and convincingly proving that it would have fired [complainant] in the absence of his whistleblowing").

senior ERAC employee. (Pl. 56.1¶259) The notes state that the meeting's purpose was to discuss the Written Warning, but the notes also repeatedly refer to Plaintiff's protected complaints. (Id.) The notes further describe Plaintiff in a disparaging way as "emotional" and "not the best person" (id.), which a juror could understand reflected their annoyance and hostility toward her complaints. One day before issuing the warning, on October 23, Dorritie's notes state, "This is retaliation" (id.), correctly anticipating how Plaintiff, and a juror, might view the circumstances. Based on these notes, a juror could find that Defendant improperly considered Plaintiff's protected complaints when giving Williams the Written Warning.[29]

## IV.    THE BANK'S POST-EMPLOYMENT RETALIATION AGAINST PLAINTIFF

Not satisfied with firing Williams, JPMorgan also interfered with her subsequent job search.  Defendant refused to confirm in a timely manner Williams's employment at the Bank and Plaintiff lost a job with OAG.  Summary judgment should be denied given disputes of fact.

First, Defendant argues incorrectly that Plaintiff failed to exhaust the post-employment retaliation claim. "No particular form of complaint is required to trigger a claim before OSHA." Feldman-Boland v. Stanley, 2016 WL 3826285, at *5 (S.D.N.Y. July 13, 2016). "An employee exhausts [her] administrative remedies if the civil claim grows out of or is like or reasonably related to  the  substance  of  the  allegations  in  the  administrative charge, the undersigned must construe OSHA complaints liberally, and the undersigned may consider a civil action 'as broad as the scope of any investigation that reasonably could have been expected to result in the initial charge of discrimination." Shearrer v. Norfolk S. Ry. Co., 2021 WL

---

[29] See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003) (holding notation indicating plaintiff's race, found on his application for promotion supports pretext); Moody v. Pepsi-Cola Metro. Bottling Co., 915 F.2d 201, 209 (6th Cir. 1990) (personnel plans which stated "age" next to name of employee who was fired were evidence of age discrimination); Schneider v. Regency Heights of Windham, LLC, 2016 WL 7256675, at *11 (D. Conn. Dec. 15, 2016) (notation in firing email mentioning plaintiff's age, with more information, suggested animus towards older workers).

871356, at *5 (N.D. Ala. Mar. 9, 2021). Similarly, under Title VII, the Second Circuit has

recognized that an initial agency complaint need not detail every instance of discrimination. "The

'reasonably related' exception . . . is essentially an allowance of loose pleading . . . and that their

primary purpose is to alert the [agency] to the discrimination that a plaintiff claims [she] is

suffering." Williams v. New York City Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006).[30]

While Plaintiff did not specifically allege post-employment retaliation in her OSHA

filing, she did allege that the Bank "repeatedly subjected Williams to adverse actions." (Pl.

56.1¶131) The OSHA filing identified examples of adverse actions during her employment. (Id.)

Given the comprehensive retaliation Plaintiff described, it is reasonable to expect that an OSHA

investigation would uncover the post-employment retaliation as continuing retribution.[31]

Second, Defendant contends that SOX does not prohibit post-dismissal retaliation.  To

the contrary, this Court in Kshetrapal v. Dish Network, LLC, 90 F. Supp. 3d 108 (S.D.N.Y.

2015), held that a plaintiff's deposition testimony about alleged fraud was protected under SOX

although the deposition took place after his employment.  Id. at 113-14.  The Court concluded

that "a contrary holding would discourage employees from exposing fraudulent activities of their

former employers for fear of retaliation in the form of blacklisting or interference with

---

[30] See Edwards v. Murphy-Brown, LLC, 760 F. Supp. 2d 607, 626 (E.D. Va. 2011) ("To compel the charging party to specifically articulate [to the agency] the full panoply of discrimination which he may have suffered may cause the very persons [the statute] was designed to protect to lose that protection. . . ."); EEOC v. David Lerner Assocs., Inc., 2005 WL 2850080, at *4 (D. Conn. Oct. 27, 2005) (allowing claims of unwelcome touching not mentioned in initial charge, but uncovered in later investigation).

[31] See Jones v. Southpeak Interactive Corp. of Del., 777 F.3d 658, 669 (4th Cir. 2015) (failure to clearly identify defendants in the OSHA complaint was not fatal to SOX-retaliation claim); Shearrer, 2021 WL 871356, at *5 (although plaintiff failed to mention instance of protected activity in OSHA filing or amendment, holding that plaintiff exhausted issue as reasonably related to other protected activity); Feldman-Boland, 2016 WL 3826285, at *5 (plaintiff exhausted SOX claims despite providing little detail regarding alleged protected activity).

subsequent employment. Such a result would contravene the purpose of SOX." Id. at 114.[32]

Third, the evidence shows that Defendant interfered with her job search efforts. Plaintiff undisputedly received a conditional job offer from OAG on December 18, 2019; OAG's office sought to speak to the Bank; and the Bank did not talk to OAG; and OAG withdrew its offer. (Pl. 56.1¶¶125-27, 285-88)  There is evidence that JPMorgan refused to engage with OAG because of Plaintiff's protected activity.  At the time of OAG's inquiry, JPMorgan's investigation was underway and Plaintiff had rejected the Bank's severance offer (id.¶¶81-90, 126, 245-54); thus, a juror could conclude that the Bank understood Plaintiff to be planning to pursue legal claims. Further, the Bank has made no effort justify its failure to speak to OAG about Plaintiff.  A jury could find that JPMorgan sabotaged plaintiff's efforts to secure employment at OAG because of Plaintiff's complaints.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Plaintiff's 56.1 Statement and supporting evidence, Defendant's motion for summary judgment should be denied in its entirety.

Dated: New York, New York
     May 20, 2022

                               VLADECK, RASKIN & CLARK, P.C.

                               /s/ Jeremiah Iadevaia
                    By:_____
                              Jeremiah Iadevaia
                              Kathleen C. Riley
                              Brandon R. White

---

[32] See Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997) (holding that the term "employees" in Title VII's anti-retaliation provisions encompasses former employees); United States ex rel. Felten v. William Beaumont Hospital, 993 F.3d 428, 431-35 (6th Cir. 2021) (False Claims Act whistleblower protection provision, similar to SOX, protects former employees).  Likewise, the Administrative Review Board has recognized that SOX protects individuals post-employment. See Levi v. Anheuser Busch Inbev, 2014 WL 4050091, at *2 (ARB July 24, 2014) (ALJ erred in limiting consideration of whistleblower activity to actions occurring before discharge).