UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ SHAQUALA WILLIAMS,                   │
│                                      │
│      Plaintiff,                      │
│                                      │
│      -v-                             │
│                                      │
│ JPMORGAN CHASE & CO.,                │
│                                      │
│      Defendant.                      │
└─────────────────────────────────────┘
```

21-cv-9326 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

　　　Plaintiff Shaquala Williams brings this action against her
former employer, defendant JPMorgan Chase Bank, NA ("JPMorgan"
or the "Bank"), alleging that JPMorgan violated the Sarbanes-
Oxley Act's whistleblower retaliation protections, 18 U.S.C. §
1514A, by terminating her employment and later impairing her
ability to obtain other employment, in retaliation for her
internally raising what she believed were compliance issues at
the Bank.  Now before the Court is JPMorgan's motion for summary
judgment in full.  For the reasons set forth below, JPMorgan's
motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Factual Background

　　　Except where otherwise noted, the following undisputed facts
are taken from the parties' Rule 56.1 Statements:[1]

---

[1] In its responsive 56.1 statement, JP Morgan repeatedly takes
the position that Williams's factual assertions are "[a]dmitted

Parties

Defendant JPMorgan, a multinational investment bank and financial services company, is a publicly traded Delaware corporation with its principal executive offices in New York City. ECF No. 1 ("Complaint") ¶ 6.  Plaintiff Shaquala Williams, a resident of New Jersey, is a former employee of JPMorgan's New York City office.  Id. ¶ 5.

Williams's Role and Duties at JPMorgan

On July 30, 2018, Williams began working at JPMorgan as a Vice President in the Global Anti-Corruption Compliance ("GACC") department, which oversees the Bank's Anti-Corruption Compliance Program.  ECF No. 27 ("Pl.  56.1") ¶¶ 134-35; ECF No. 20-1 ("Def. 56. 1") ¶ 6.  Williams was assigned to the Third-Party Intermediary ("TPI") workstream of the program.  As set out in her job description, her duties included, inter alia, "advising Anti-Corruption Compliance Officers and business relationship managers on mitigating corruption-related risk connected to third party intermediaries," that is, individuals or companies engaged by JPMorgan to interact with third parties to obtain or retain business or government action.  Def. 56.1 ¶ 11.  At the time she

_____

for purposes of this motion only." See, e.g., ECF No. 30 ¶¶ 137, 140-43.  Accordingly, the Court treats these factual assertions as undisputed for the purposes of this motion. See S.E.C. v. Constantin, 939 F. Supp. 2d 288, 302 (S.D.N.Y. 2013).

was hired, Williams reported to Garret Ross, head of the TPI
workstream, who in turn reported to Timothy Bridgeford, Global
Head of Anti-Corruption and Global Head of Antitrust Compliance.
Id. ¶ 13.

   Williams's Complaints

   Williams began reporting concerns about JPMorgan's compliance
culture early in her tenure.  On August 10, 2018 — fewer than two
weeks after she started at the Bank — Williams emailed Ross to
communicate that JPMorgan's compliance software was ineffective at
sanctions screening and assigned inaccurate risk ratings to TPIs
in sanctioned regions.  Pl. 56.1 ¶ 160. In other words, Williams
was complaining that, at least in certain cases, the software did
not take account of whether third parties with which JPMorgan did
business were themselves subject to sanctions for noncompliance
with the law and, if so, had complied with the sanctions. Ross
replied that sanctions compliance was "not [the] job" of the TPI
stream and ordered Williams not to look into those issues further.
Id.

   Williams continued to regularly raise compliance issues with
her supervisors.  For example, she emailed Bridgeford, her second-
level supervisor, to complain about her department's compliance
culture and to seek permission to escalate her sanctions concerns
with the relevant team.  Id. ¶ 161; ECF No. 25-22.  But despite
Bridgeford's blessing, Ross ordered her to cancel the meeting

3

scheduled to address problems with sanctions screening, telling Williams that JPMorgan was "political" and that resolving sanctions issues would take too much work.  Pl. 56.1 ¶ 161.

In addition to flagging insufficient sanctions screening, Williams also escalated a number of other concerns about practices at the Bank.  Throughout Williams's employment with JPMorgan, the Bank was bound by both a Non-Prosecution Agreement ("NPA") with the Department of Justice and a Cease-and-Desist Order ("C&D") emanating from the Securities and Exchange Commission ("SEC"). Id. ¶ 144.  As early as September 2018, Williams began objecting to practices that she viewed as inconsistent with SEC rules and regulations, the NPA, and/or the C&D, including incidents in which she observed inaccurate record-keeping, illicit payments to TPIs, and misleading reports to regulators, among other issues.  Id. ¶ 158-59.

Williams also complained that Ross and others were covering up problems with the TPI program by using inaccurate metrics and euphemistic terminology in reports to avoid oversight.  Id. ¶ 150. She regularly broached these issues with her direct supervisors, Human Resources ("HR"), and other senior executives above her throughout her employment and documented perceived problems by email and in official logs.  Id. ¶ 139.

The "Opportunities and Enhancements" Meetings

In November 2018, Bridgeford created a series of "Opportunities and Enhancements" meetings at which Williams could present potential compliance problems that Williams had previously reported in a larger meeting with senior executives. Id. ¶ 166-69. Among other things, Williams had expressed concern about GACC culture and about the Compliance program to Bridgeford throughout August, September and October 2018. Id. ¶ 172. During that time, she raised the possibility of escalating to Human Resources her concerns about Ross's behavior, including his aggressiveness towards her and his discouraging her from raising compliance issues. Id. ¶ 172. In response, Bridgeford told Williams that doing so would not be looked upon favorably. Id. ¶ 173. During a conversation about Williams's self-evaluation in October 2018, he further discouraged Williams from using the term "gap" in her reports. Id. ¶ 174. Williams reported this interaction to Human Resources, apparently upsetting Bridgeford. Id.

Although given the opportunity to escalate her compliance concerns through the "Opportunities and Enhancements" meeting, Williams viewed these meetings with suspicion. In particular, Williams believed that Bridgeford created the "Opportunities and Enhancements" meetings to sequester TPI issues from the larger leadership group. Id. ¶ 169. At the first of these meetings, Ross and Bridgeford told Williams to change the wording of her

report from "Gap, Issue, and Risk" to "Under Review and Opportunities," a step that, in her view, showed a reliance on an inappropriate euphemism.  Id. ¶ 170.  During a January 2019 check-in meeting, Ross called Williams "insubordinate" for escalating an issue at one of these meetings without his prior approval.  Id. ¶ 171.

### Williams Complains About Ross and Bridgeford

In November 2018, Williams discussed Ross's and Bridgeford's behavior, as well as issues with the Bank's compliance programs, with the Head of Code of Conduct at JPMorgan, who then reached out to Bridgeford's supervisor Jennifer Boyle-Devine.  Id. ¶¶ 175-76. Williams relayed her concerns to Boyle-Devine in a meeting on November 14, 2018.  Id. ¶ 177.  Around this time, Ross removed significant responsibilities from Williams, essentially narrowing the scope of her duties to focus solely on TPI issues.  Id. ¶ 178.

### The 2018 End-of-Year Performance Evaluation

In January 2019, Williams was given her final annual performance evaluation, in which Ross assessed Williams the below-expectations rating of "Growth Area" in the Teamwork and Leadership category.  Def. 56.1 ¶¶ 37-39.  The evaluation criticized Williams for using "imprecise language" and for "escalating matters prematurely."  Pl. 56.1 ¶¶180-83; ECF No. 25-30 at 3.  In an email to an HR representative, Williams stated that Ross indicated these criticisms were directly related to the manner in which Williams

raised her compliance complaints.  ECF No. 25-17 at 1.  An earlier draft, prepared by Ross in September 2018 as part of a "Performance Calibration Worksheet," assigned Williams an "On Track" rating in each of the three categories assessed, though it noted some areas in which there was "room for improvement."  ECF No. 21-11 at 33.

### The First Investigation Is Initiated

Upon receiving the evaluation, Williams, viewing the lower revised ratings as retaliation for her reports, complained to HR, who then escalated the complaint to the Bank's Employee Relations division.  Pl.  56.1 ¶ 184.  Employee Relations investigated Williams's complaints about the performance review and about the compliance concerns and retaliation separately.  Id. ¶ 186. Williams provided additional information and documentation on several occasions to support the investigation, which continued until June 2019.  Id. ¶¶ 187, 190, 195.  In March 2019, before the investigation concluded, Ross was removed as Williams's supervisor.  Id. ¶ 196.  As JPMorgan admits for purposes of this motion, Ross's removal was because of Williams's complaints.  Id. For reasons the parties dispute, Bridgeford also left JPMorgan in April 2019.  Def. 56.1 ¶ 52.  Williams learned that same month that she would report to Melissa Laferriere, the new Co-Head of GACC.  Pl. 56.1 ¶ 200.

Williams's Complaints Continue

After the first investigation concluded in June 2019, Williams began directing her compliance complaints to her new supervisor, Laferriere.  Id. ¶¶ 226-27.  For example, Williams complained to Laferriere and others about a model used to determine the level of risk associated with a TPI, which, in Williams's view, lacked appropriate internal controls.  Id. ¶ 219.  Williams also began complaining about Laferriere to JPMorgan's Employee Relations and Human Resources divisions.  Specifically, on August 14, 2019, Williams reported that, like Ross and Bridgeford before her, Laferriere was forcing Williams to use euphemisms to cover up compliance issues and was otherwise preventing Williams from presenting the full scope of the issues found.  Id. ¶ 228.  She also accused Laferriere of excluding her from certain workflows in retaliation for her previous escalations.  Id.

Throughout the month of August, Williams continued to escalate these concerns within the Bank.  Id. ¶¶ 229-31.  On September 6, 2021, Williams took these complaints directly to Laferriere, orally accusing her of unlawful treatment, including excluding Williams from meetings.  Id. ¶ 233.  Williams reiterated these complaints in an email, sent September 11, 2019, in which she also told Laferriere that she had escalated her concerns about Laferriere's exclusionary activity to Human Resources.  Id. ¶ 235.

The Second Investigation

On September 11, 2019, JPMorgan opened a second investigation in response to Williams's complaints regarding both JPMorgan's purported compliance failures as well as Laferriere's purported retaliatory actions. Id. ¶¶ 237-39. Williams continued to supplement her earlier complaints in writing to those JPMorgan employees conducting the second investigation throughout September and October 2019. Pl. 56.1 ¶¶ 245-250. The investigation into the underlying business practices that Williams reported continued into 2020, though the Bank contends that the Human Resources prong of the investigation had concluded by October 2019 — a contention Williams disputes. Def. 56.1 ¶ 93; Pl. 56.1 ¶ 93.

The Written Warning

On October 3, 2019, Laferriere prepared a "Performance Calibration Committee" worksheet that assigned Williams a below-expectation rating of "Growth Area" in a number of categories. Def. 56.1 ¶¶ 105-06. In support of these ratings, Laferriere cited instances in which, for example, Williams tried to shift responsibility for her work onto colleagues. Id. ¶ 108. According to Laferriere's deposition testimony, around the same time that she was preparing the "Calibration" worksheet she was also talking to Boyle-Devine about what further steps could be taken to ensure Williams "was taking the feedback seriously," including the issuance of a formal "Written Warning." ECF No. 25-4 at 310-12.

For the purposes of this motion, JPMorgan admits, "[b]efore September 11, 2019, when Plaintiff made her complaints to Laferriere, there were no discussions about issuing Plaintiff a Written Warning, firing Plaintiff, or taking any other corrective action against Plaintiff." Pl. 56.1 ¶ 256. Laferriere drafted a Written Warning for Williams and sent it to Boyle-Devine on October 10, 2019. Id. ¶ 257.

On October 24, 2019, Boyle-Devine met with Williams and delivered the Written Warning. Def. 56.1 ¶ 112. When the Written Warning was delivered, Williams was told that she would have one week to challenge, provide feedback on, or otherwise respond to the Warning. Pl. 56.1 ¶¶ 261, 263. The Warning included a number of specific examples of Williams's behavior, including that, "[o]n August 25th and 26th, [Williams] accused three EMEA regional team members of attempting to intentionally hide risk issues from senior management due to edits they had suggested to language she had drafted in a power point deck." ECF No. 21-5 at 4.

The Warning advised that "[i]mmediate and sustained improvement is required" and that failure to meet expectations could result in "additional corrective action up to and including termination of employment." Id. at 5.

<u>Williams's Employment is Terminated</u>

On October 30, 2019, six days after the Warning was delivered, Williams was notified by JPMorgan that her employment was being

terminated.  Def. 56.1 ¶ 123.  The Bank immediately placed Williams on administrative leave.  Pl. 56.1 ¶277.  The termination was made effective November 15, 2019, Def. 56.1 ¶ 123, when JPMorgan issued its Recommendation of Termination, ECF No. 21-1 at 15.  The Recommendation of Termination, which lists Laferriere and Boyle-Devine as its preparers, stated as the reasons for termination that, since the "Written Warning was delivered, [Williams] has shown no intention of showing immediate and sustain improvement on the issues raised in the warning."  Id.

Williams's Employment History after JPMorgan

On December 18, 2019, the Office of the New York State Attorney General ("OAG") made Williams a conditional offer of employment subject to a background check.  OAG emailed JPMorgan to speak with an HR contact, and the Bank replied with an email address and fax number that could be used for employment verification.  The Bank's reply noted that "JPMorgan Chase does not provide personal and/or character statements/references or details regarding the reason for an employee's termination."  Pl. 56.1 ¶¶ 285-88.  OAG subsequently withdrew its offer.  Id. ¶ 287. Williams later secured a position with Wells Fargo involving similar responsibilities to her role at JPMorgan.  Def. 56.1 ¶¶ 128-29.

## II.  Procedural Background

Williams filed a complaint with the Department of Labor, Occupational Health and Safety Administration ("OSHA") on April 27, 2020, alleging that JPMorgan's conduct during and subsequent to her employment violated the Sarbanes-Oxley Act.  ECF No. 21-5. OSHA issued the Secretary's Findings (the "Findings" or the "OSHA Decision") on April 30, 2020.  OSHA found that "[Williams's] claims [that JPMorgan] limited her responsibilities, gave her an unfavorable performance evaluation in or about January 2019, and issued her a written warning on October 24, 2019 . . . were issued beyond the 180 [day] filing period and were not timely filed." Id.  The Findings also stated that Williams's complaint about her termination was timely filed and that the parties are covered under the Sarbanes-Oxley Act.   The OSHA decision concluded that "[JPMorgan] has shown by clear and convincing evidence, absent [Williams's] alleged protected activities, they would have taken the same adverse action" and found "no reasonable cause to believe [JPMorgan] violated SOX."   OSHA therefore dismissed Williams's complaint.  Id.

On November 11, 2021, Williams filed the instant suit against JPMorgan, alleging that the Bank violated the "whistleblower" protections of the Sarbanes-Oxley Act of 2002 by terminating her and interfering with her post-employment opportunities in retaliation for Williams's protected activity.   ECF No. 1.

JPMorgan moved for summary judgment on April 29, 2022.   ECF No. 19.   Following oral argument on JPMorgan's motion on July 19, 2022, the Court issued a bottom-line order from the bench granting the motion as to Williams's post-employment claim but denying it as to her termination-based claim.   See Transcript of July 19, 2022 Hearing. This Memorandum confirms those decisions and elaborates the reasons for them.

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure requires a movant to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" for summary judgment to be appropriate."   The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in favor of that party."   Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).[2]

## DISCUSSION

Plaintiff Williams brings this claim under Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"), which

---

[2] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

protects employees from retaliation for engaging in protected activity.  Williams can establish a prima facie case of prohibited retaliation under Section 806 by proving by a preponderance of the evidence that: (1) she engaged in activity protected under Sarbanes-Oxley, (2) JPMorgan knew that she engaged in protected activity, (3) Williams suffered an adverse personnel action, and (4) the protected activity was a contributing factor in the unfavorable action.  Bechtel v. Admin. Review Bd., 710 F.3d 443, 447 (2d Cir. 2013).  To avoid liability if these four elements are established, JPMorgan must prove by clear and convincing evidence that the Bank would have taken the same adverse action against Williams in the absence of her protected activity.  Tonra v. Kadmon Holdings, Inc., 405 F. Supp. 3d 576, 589 (S.D.N.Y. 2019).

Williams contends that JPMorgan violated Section 806's whistleblower protections by retaliating against her for the complaints she raised internally regarding purported violations of the SEC's rules and regulations.  Specifically, Williams points to her termination, as well as JPMorgan's alleged interference with her subsequent job search, as adverse personnel actions taken in response to her protected activity. Although JPMorgan does not dispute that Williams engaged in protected activity during her tenure at the Bank, it seeks summary judgment on the ground that Williams had not timely

14

exhausted her administrative remedies, that Williams has not
established a prima facie case, and that there is clear and
convincing evidence establishing JPMorgan's affirmative defense.
The Court addresses these arguments in turn.

I.   **William's Post-Employment Claims**

To bring a claim in federal court under the Sarbanes-Oxley
Act, an employee must first exhaust her administrative remedies.
See Daly v. Citigroup Inc., 939 F.3d 415, 427 (2d Cir. 2019).
To do so, "the employee must file a complaint with [OSHA] and
afford OSHA the opportunity to resolve the allegations
administratively." Sharkey v. J.P. Morgan Chase & Co., 805 F.
Supp. 2d 45, 51 (S.D.N.Y. 2011). Only "if OSHA has not issued a
final decision within 180 days of the filing of the complaint
and there is no showing that such delay is due to the bad faith
of the claimant" may an employee proceed by bringing an action
in the district court. Id. (quoting 18 U.S.C. §
1514A(b)(1)(B)). The Second Circuit has held that these
exhaustion requirements "are jurisdictional and a prerequisite
to suit in federal court." Daly, 939 F.3d at 428.

Williams was terminated on October 30, 2019 and filed a
complaint with OSHA on April 27, 2020. OSHA issued a decision
on April 30, 2020 dismissing the termination claims on the
merits and dismissing "[Williams's] claims [that JPMorgan]
limited her responsibilities, gave her an unfavorable

performance evaluation in or about January 2019, and issued her a written warning on October 24, 2019" on the ground that they "were issued beyond the 180 [day] filing period and were not timely filed." Def. 56.1 ¶ 132. The parties do not dispute that this Court has jurisdiction to hear plaintiff's claim that her termination constituted a violation of SOX and that Williams failed to timely file her pre-termination claims.[3] However, JPMorgan argues that Williams failed to exhaust administrative remedies for her post-employment retaliation claim, entitling it to summary judgment on that claim for lack of jurisdiction.

Although acknowledging her failure to amend her administrative complaint to allege the later claim of post-employment retaliation, Williams cites an exception to Title VII's administrative exhaustion requirement under which claims "reasonably related" to those in the complaint to the agency may be pursued in the district court, even if never presented to the agency. See Williams v. New York City Hous. Auth., 458 F.3d 67, 71 (2d Cir. 2006) (allowing race discrimination claims to proceed in court as "reasonably related" to gender

---

[3] Although the pre-termination adverse actions do not support separate claims under the Act, as plaintiff concedes, the underlying conduct may still be relevant in so far as it relates to Williams's timely termination claim. See, e.g., Jute v. Hamilton Sundstrand Corp., 420 F. 3d 166, 176 (2d Cir. 2005); Dodd v. City Univ. of New York, 489 F. Supp. 3d 219 (S.D.N.Y. 2020).

discrimination claims presented to the EEOC).  But Williams fails to identify any case law in this Circuit applying the "reasonably related" exception to an otherwise untimely SOX claim.  To the contrary, the Second Circuit has explained that "the administrative scheme of [Sarbanes-Oxley] differs significantly from that of Title VII": "while [Sarbanes-Oxley] is 'judicial in nature and is designed to resolve the controversy on its merits,' the procedures of Title VII are 'geared toward fostering settlement.'" Daly, 939 F.3d at 428 (quoting Roganti v. Metropolitan Life Ins. Co., 2012 WL 2324476, at *6 (S.D.N.Y. 2012)).  And relying on this difference, courts addressing this question have held that the "reasonably related" exception does not apply to claims under Sarbanes-Oxley.  See, e.g., Roganti, 2012 WL 2324476, at *6; Willis v. Vie Fin. Grp., Inc., 2004 WL 1774575, at *6 (E.D. Pa. Aug. 6, 2004). Accordingly, because Williams failed to administratively exhaust her post-employment retaliation claim, the Court grants summary judgment dismissing that claim.

Independently, even assuming arguendo that this Court had jurisdiction over plaintiff's post-employment claim, the Bank would still be entitled to summary judgment on the merits. Williams argues that the Bank "refused to engage with OAG," leading OAG to withdraw its offer of employment to Williams. Pl. Br. 25.  But as JPMorgan points out, the Bank responded to

17

OAG with the contact information from which employment verification could be obtained — the OAG simply failed to pursue the matter any further.  Def. 56.1 ¶¶ 124-27.  Thus, the record does not support a finding that JPMorgan took any adverse action against Williams after she was terminated.  Williams's post-termination claim therefore lacks merit, and JPMorgan would be entitled to summary judgment even if the Court had jurisdiction over the claim.

## II.  Williams's Termination Claim

### A.  Prima Facie Case

As noted, to make a prima facie case under Section 806, Williams must demonstrate that (1) she engaged in protected activity; (2) JPMorgan knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.  Bechtel, 710 F.3d at 447.  JPMorgan contends that no reasonable jury could find that Williams's protected activity was a contributing factor in JPMorgan's decision to terminate her employment.

"The words 'a contributing factor' mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 449 (S.D.N.Y. 2013).  "A plaintiff need not prove that her protected activity was the primary

18

motivating factor in her termination, or that the employer's
articulated reason was pretext in order to prevail." Id.
Moreover, a plaintiff need not offer direct evidence of
retaliatory animus to establish the causal connection between
the protected activity and the adverse employment action —
rather, a prima facie case can be established through
circumstantial evidence, such as "temporal proximity,
indications of pretext, inconsistent application of an
employer's policies, an employer's shifting explanations for its
actions, antagonism or hostility toward a complainant's
protected activity, the falsity of an employer's explanation for
the adverse action taken, and a change in the employer's
attitude toward the complainant." Kurec v. CSX Transportation,
Inc., 2020 WL 6484056, at *9 (N.D.N.Y. Nov. 4, 2020).

Unsurprisingly, Williams and JPMorgan have different views
as to why Williams was terminated, and the two parties cite
disparate evidence supporting their respective versions of the
events.  Williams contends that she was terminated because of
the complaints she made regarding what she considered to be
serious compliance issues within the Bank, including complaints
against her supervisors — Ross, Bridgeford, and, later,
Laferriere — whom she accused of, inter alia, trying to hide
issues from regulators through the use of euphemistic
terminology.  Pl. 56.1 ¶¶ 150, 174, 228.

Williams cites two sets of circumstantial evidence in support of this position.  First is the "temporal proximity" between Williams's complaints regarding Laferriere and the issuance of the Written Warning and Williams's termination. Williams began complaining to Employee Relations and Human Resources about Laferriere in mid-August 2019, continuing through September, leading JPMorgan to open an investigation on September 11, 2019.  Pl. 56.1 ¶ 228-30.  Mere weeks later, on October 10, 2019, Laferriere sent Boyle-Devine the draft of the Written Warning.  The Warning was delivered on October 24, 2019, leading to Williams's termination on October 30, 2019.  Id. ¶¶ 257, 261, 263, 277.  This chain of events, all occurring within the span of approximately two months, supports a retaliatory inference.  See Antonmarchi v. Consol.  Edison Co.  of New York, 2008 WL 4444609, at *13 (S.D.N.Y. Sept. 29, 2008) ("The Second Circuit has held a temporal proximity of less than two months between complaint and adverse action sufficient to support an inference of retaliation." (citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)), aff'd, 514 F. App'x 33 (2d Cir. 2013).

Second, Williams points to the antagonistic manner in which her supervisors reacted to her complaints.  Williams cites numerous instances in which her supervisors reacted negatively when she raised what she perceived to be issues of concerns,

including when Bridgeford told her that escalating concerns about Ross would not be seen favorably, Pl. 56.1 ¶ 173, and when her 2018 performance evaluation criticized Williams for "escalating matters prematurely," ECF No. 25-30 at 3.   Indeed, the Warning Letter, which ultimately provided the basis for Williams's termination, explicitly referenced Williams's accusations that certain JPMorgan employees were intentionally hiding risk issues as an example of her problematic behavior. See ECF No. 21-5 at 4.   While JPMorgan characterizes these criticisms to be of the manner in which Williams engaged in protected activity, rather than of the activity itself, that Williams's purportedly problematic behavior is "itself inextricably intertwined with the protected activity" supports her prima facie claim.   Kaplan v. New York State Dep't of Lab., 2021 WL 1088463, at *14 (S.D.N.Y. Mar. 22, 2021).

JPMorgan, on the other hand, argues that Williams was dismissed "based on chronic deficiencies in her performance and behavior," citing numerous incidents in which managers and co-workers complained about Williams during her time at JPMorgan. ECF No. 20 at 6.   In particular, JPMorgan argues that Williams's performance and behavioral deficiencies "were documented before any alleged protected activity," citing performance coaching Williams was given by Ross in September 2018 and then the

negative performance calibration worksheet Ross prepared later
that month.  Def. 56.1 ¶¶ 10, 15, 25.

As a preliminary matter, it is far from clear "[w]hether
such alternative causes [for termination] can, as a matter of
law, defeat inferences from temporal proximity on summary
judgment" in the context of a claim under the Sarbanes-Oxley
Act.  Herrera v. Trabajamos Cmty. Head Start, Inc., 236 F. Supp.
3d 858, 869 (S.D.N.Y. 2017) (analogizing the American Recovery
and Reinvestment Act to the provisions of the Sarbanes-Oxley Act
at issue here).  "The fact that [the Act] provides that a
defendant can rebut a plaintiff's case using evidence that the
whistleblower would have been fired in any event suggests that
such matters are not properly part of the contributing factor
analysis."  Id. at 869 (S.D.N.Y. 2017); see also Sharkey, 660
Fed. Appx. at 67-68 ("[a]ssuming without deciding that a
legitimate intervening basis can defeat an inference of
causation from temporal proximity").

Ultimately, the Court need not reach this issue, because,
assuming arguendo that the contributing factor inference can be
rebutted in this way, the Bank's argument falls short:  As the
undisputed facts evidence, Williams had begun engaging in what
the Bank does not contest was protected activity as early as
August 10, 2018 — fewer than two weeks after starting with
JPMorgan and before Ross's criticisms began.  Pl. 56.1 ¶ 160.

22

Accordingly, contrary to JPMorgan's assertions, this case cannot be characterized as one in which the inference of retaliation is overcome by the "gradual adverse job actions [that] began well before the plaintiff had ever engaged in any protected activity." Slattery v. Swiss Reinsurance America Corp., 248 F. 3d 87, 95 (2d Cir. 2001).

JPMorgan also cites the evidence that it encouraged Williams to undertake the purportedly protected activity, such as by creating the "Opportunities and Enhancement" meetings specifically to provide her with a platform for escalating her concerns, Def. 56.1 ¶¶ 25-26, as rebutting any evidence that the Bank responded antagonistically toward her complaints.  But evidence that the Bank supported Williams's protected activity cannot, at the summary judgment stage, defeat competing evidence that the protected activity contributed to her termination. Ultimately, "to weigh these competing narratives," requires "evaluat[ing] the credibility" of plaintiff and her supervisors, a task reserved for trial. Perez v. Progenics Pharms., Inc., 965 F. Supp. 2d 353, 368 (S.D.N.Y. 2013).

Therefore, drawing all inferences in favor of plaintiff, the Court finds that a reasonable jury could conclude that Williams's protected activity was a contributing factor toward her termination. As such, JPMorgan is not entitled to summary

judgment on the ground that Williams failed to make out a <u>prima</u> <u>facie</u> case on her termination claim.

B. JPMorgan's Affirmative Defense

In the alternative, JPMorgan argues it is entitled to summary judgment on the ground that there is "clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of [Williams's] protected behavior." <u>Tonra</u>, 405 F. Supp. 3d at 589. This affirmative defense imposes an "extremely heavy burden" on the defendant at the summary judgment stage, requiring the court to conclude that, "as a matter of law, a reasonable jury must [find], by clear and convincing evidence," JPMorgan would have discharged Williams in the absence of her protected activity." <u>Sharkey v. J. P. Morgan Chase & Co.</u>, 2018 WL 1229831, at *10 (S.D.N.Y. Mar. 5, 2018).

As it did in seeking to defeat the inference that her protected activity was a "contributing factor" in Williams's termination, the Bank points to evidence that performance issues unrelated to her protected activity motivated Williams's termination. For example, JPMorgan notes that she received below-expectations marks on both of her annual reviews and that she was the subject of numerous complaints from both managers and co-workers, including a junior co-worker who complained to Human Resources that Williams was causing him emotional

24

distress.  See Def. Br.  21-22.  Taken on their own, these
incidents suggest that JPMorgan "received complaints of
[Williams's] poor performance from [her] co-workers and relied
on those complaints in terminating her," thus providing a basis
for termination unrelated to her protected activity.  Pardy v.
Gray, 2008 WL 2756331, at *7 (S.D.N.Y. July 15, 2008).
But placed in the broader context, JPMorgan's reasons for
terminating Williams appear less clear.

     As the Bank acknowledges, although the performances issues
cited by JPMorgan are said to have begun early in Williams's
tenure, "there was no discussion of issuing Williams a Written
Warning, firing her, or taking any other corrective action"
prior to the opening of the investigation on September 11, 2019.
Def. Resp. ¶ 256.  Indeed, as JPMorgan notes, Williams "was only
subject to routine performance management — e.g., constructive
feedback in meetings, emails, and performance reviews — until
October 24, 2019."  Def. Br. 2.  This context, along with the
fact that Williams's performance reviews also contained some
praise, suggests that something besides Williams's performance
triggered the adverse action, supporting the inference that
JPMorgan's rationale for terminating her was pretextual.  See
Ashmore v. CGI Grp. Inc., 138 F. Supp. 3d 329, 347 (S.D.N.Y.
2015) (denying summary judgment where, "[a]though it [was] clear
that [p]laintiff's performance was wanting, it [was] not clear

25

that these insufficiencies alone warranted [p]laintiff's discharge," particularly given the temporal proximity between the protected activity and the termination as well as the fact that the "evaluation of [p]laintiff was complimentary in certain areas"), aff'd, 923 F.3d 260 (2d Cir. 2019).

Drawing all inferences in Williams's favor, there is thus a genuine dispute of material fact as to whether the record clearly and convincingly shows that JPMorgan would have terminated Williams notwithstanding her protected activity.

Accordingly, the Court denies JPMorgan's motion for summary judgment on Williams's termination-based claim.

### CONCLUSION

For the foregoing reasons, the Court GRANTS JPMorgan's summary judgment motion as to Williams's post-employment claim and DENIES the motion as to her termination-based claim.

SO ORDERED.

Dated: New York, New York

July 26, 2022

_____

Jed S. Rakoff, U.S.D.J.